******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL EDMONDS
(SC 19389)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued September 10, 2015—officially released September 13, 2016*

*Bradford Buchta*, assistant public defender, with whom, on the brief, was *Nicole Donzello*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with

whom, on the brief, were *John C. Smriga*, state's attorney, and *Marc R. Durso*, assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Michael Edmonds, appeals from the judgment of the Appellate Court affirming his conviction, following a conditional plea of nolo contendere, of one count of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a), and one count of failure to appear in the first degree in violation of General Statutes § 53a-172. See *State* v. *Edmonds*, 151 Conn. App. 763, 765, 96 A.3d 607 (2014). On certification to this court, the defendant contends that the Appellate Court improperly concluded that: (1) the trial court, *Rodriguez, J.*, in denying the defendant's motion to suppress narcotics evidence, correctly determined that the defendant was not seized until police officers performed a patdown search for weapons; and (2) the record was inadequate to review the defendant's claim that he was unreasonably seized, in violation of the federal and state constitutions, when two police cruisers simultaneously descended upon him from opposite directions in a small private parking lot behind a Subway restaurant and a uniformed officer verbally commanded him to stop.[1] We agree with both of the defendant's claims and conclude that the evidence the defendant sought to suppress was seized in violation of the fourth amendment to the United States constitution[2] and article first, §§ 7 and 9, of the constitution of Connecticut.[3] We therefore reverse the judgment of the Appellate Court.

Before setting forth the relevant facts and procedural history, we begin by observing that the standard of appellate review governing allegedly unconstitutional police searches and seizures differs from the standard that governs appellate review of other types of similarly fact intensive questions. It is well established that we must "undertake a more probing factual review" of allegedly improper seizures, so that we may come to "an independent legal determination of whether a reasonable person in the defendant's position would have believed that he was not free to leave." *State* v. *Burroughs*, 288 Conn. 836, 843, 844 n.5, 955 A.2d 43 (2008). "A proper analysis of this question is necessarily fact intensive, requiring a careful examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority . . . ." Id., 846. Although we must, of course, defer to the trial court's factual findings, "our usual deference . . . is qualified by the necessity for a scrupulous examination of the record to ascertain whether [each] finding is supported by substantial evidence . . . ." (Citation omitted; internal quotation marks omitted.) Id., 843. Furthermore, in reviewing the record, we are bound to consider not only the trial court's factual findings, but also the full testimony of the arresting officers; in particular, we must take account of any undisputed evidence that does not support the trial court's ruling in favor

of the state but that the trial court did not expressly discredit. See *State* v. *DeMarco*, 311 Conn. 510, 520 and n.4, 88 A.3d 491 (2014); id., 543 (*Palmer*, *J.*, dissenting).

In the present case, the trial court's oral decision, as supplemented by the undisputed testimony of the arresting officers, reveals the following relevant facts.[4] On the evening of Friday, January 28, 2011, Officers Elson Morales and Joseph Lawlor of the Bridgeport Police Department (department) were patrolling in the vicinity of Madison Avenue and Capitol Avenue. The officers had been assigned to patrol there because a large number of teenagers were expected to attend a basketball game at nearby Central High School and teenagers tended to congregate on Madison Avenue after such games, clogging traffic.

The officers testified that this area of Bridgeport is plagued by a high rate of violent crime. Both officers conceded, however, that the department considers essentially the *entire city* of Bridgeport to be a high crime area. There was no testimony that the crime rate in the neighborhood of Madison Avenue and Capitol Avenue is any higher than in other areas of Bridgeport.

At approximately 7 p.m., the two officers were driving northbound on Madison Avenue in a marked police cruiser when they stopped at a red light at the intersection of Madison and Capitol Avenues. As they waited for the light to change, they briefly observed a man, later identified as the defendant, who is black, standing alone in the parking lot at 944 Madison Avenue, behind a Subway sandwich restaurant located on the corner. Although it is not evidenced in the record, it may reasonably be assumed—and the state conceded at oral argument before this court—that the Subway restaurant would have been open for dinner at that hour.

The officers offered three reasons why the defendant aroused their suspicions at that time. First, Morales testified that, at the time the officers observed the defendant, "[i]t was pre-dark, it was starting to get dark." He indicated that the defendant "was loitering in the rear *in the shadows* . . . ." (Emphasis added.)

The trial court does not appear to have credited Morales' testimony that, at 7 p.m. on January 28, 2011, in Bridgeport, it was just "starting to get dark."[5] And for good reason. On that particular winter evening, the sun had set two hours earlier, at 5:04 p.m., and even the twilight had long since passed.[6] Moreover, there was undisputed testimony that no lights illuminated the Subway parking lot at that time. Accordingly, the only reasonable inference is that *anyone* standing outside the Subway restaurant at dinnertime on that particular evening necessarily would have been standing in the "shadows."

Second, both officers testified that the defendant aroused their suspicions because he was "loitering" in

the Subway lot. In the police report they completed the evening of the incident, the officers wrote that "we observed a heavy set black male wearing a tan colored hooded sweatshirt loitering behind the Subway [s]andwich [s]hop . . . ." In the section of the report entitled "Point of Illegal Entry/Means of Attack," the officers entered: "Loitering near Subway."

During the suppression hearing, however, both officers acknowledged that, at the time they first observed the defendant and decided to question him, they had no reason to believe that he was in violation of Bridgeport's loitering ordinance. Bridgeport Municipal Code § 9.04.010 provides: "Any person who, without permission or legitimate purpose, loiters upon the property of another or upon city-owned property, and who upon command of any police officer or person in charge of city-owned property fails to quit such property, shall be punished as provided in Chapter 1.12 of this code." In this case, there were no signs indicating "no loitering" posted at that location, and the officers had no information that the defendant was on Subway's property without permission or legitimate purpose, nor that he had been commanded to leave by a police officer or city official. Indeed, the officers readily conceded that the defendant might have been a resident of one of the apartment units located above the Subway restaurant. In addition, the period during which the officers were stopped at the red light, and had an opportunity to observe the defendant and conclude that he might be loitering, lasted only a few seconds. During that brief period, and given the poor lighting conditions, the officers were unable to determine even the defendant's skin color. All they could see was a "silhouette and just a vague color of his jacket."

Third, the officers testified that their suspicions were aroused because the Subway restaurant had been robbed multiple times in the past, including within the past year. There was undisputed testimony, however, that no incidents of any sort had been reported in the Bridgeport police logs for that Subway location during the preceding four months. Nor did the officers receive any calls with respect to that location on the date in question.

In any event, after having observed nothing more than a nondescript individual standing outside a Subway restaurant for a few seconds at 7 p.m. on a Friday evening, the officers decided to interrupt their patrol of the high school traffic situation to question him. They testified that they intended to ask him why he was in the parking lot, and whether he lived in one of the apartment units above the Subway restaurant.

There was no testimony suggesting that either Morales or Lawlor had any reason to believe that the defendant was armed or dangerous, nor that any sort of criminal activity was underway or recently had tran-

spired at that location. Nevertheless, before stopping to talk to the defendant, they decided to radio their supervisor, Sergeant Ronald Mercado, for backup. Morales testified that "[w]e wanted to try to attempt to [identify] the party and we wanted [Mercado] to cover us." Later in the hearing, Morales reiterated that the two officers contacted Mercado because "we wanted cover."

The small parking lot in which the defendant was standing formed an L shape around the rear of the rectangular Subway building. There were only two entrances/exits to the lot. The small end of the L exited onto Capitol Avenue, and the large end onto Madison Avenue. Otherwise, the lot was enclosed by the Subway building on the street corner side, and by various commercial buildings on the opposite side. The lot was private property. The defendant, who was standing in the middle of the lot, was the only person in the lot at the time of the incident.

After Mercado reached the location to provide the requested "cover" for Morales and Lawlor, the three officers in two patrol cars entered the Subway lot from opposing directions and converged on the defendant simultaneously in the middle of the lot, near a staircase leading to the apartments located above the Subway shop. Morales and Lawlor entered the lot from the Capitol Avenue entrance, while Mercado entered through the Madison Avenue entrance. Both vehicles were marked police cruisers. All three officers were in uniform, and armed. The record does not reveal whether they activated the cruisers' light bars or sirens as they approached the defendant.

The precise sequence of events from the time the officers entered the Subway lot until they frisked the defendant is less clear. In their signed police report, the officers provided the following account: "We . . . drove into the rear parking lot of [the] Subway [s]andwich [s]hop when the [defendant] turned away from us when he observed our patrol unit, Sergeant Mercado drove in from the Madison [Avenue] entrance and stopped the [defendant] . . . . [The defendant] immediately stated 'I didn't rob nobody!' He kept moving his hands around in a nervous manner and yelling 'this is embarrassing!' while continuing to state his innocence."

The officers' testimony at the suppression hearing, together with the trial court's subsequent factual findings, injected some ambiguity into three elements of the police report account of events: (1) whether Mercado entered the lot precisely at the same time as Morales and Lawlor; (2) the circumstances under which the defendant was stopped; and (3) the timing and nature of the defendant's nervous hand movements.

First, with respect to the timing of the two cruisers entering the lot and approaching the defendant,

Morales' testimony mirrored and expanded upon the account in the officers' police report: "As we entered from Capitol [Avenue] into the rear parking lot of Subway we observed the [defendant] still in the shadow of the parking lot. He immediately—when he saw our car, it's a marked unit, he immediately turned around and started walking away. That's—at the time when we went to go around the L shape of—toward Madison [Avenue] Sergeant Mercado entered in his marked unit and was able to stop the [defendant]." Morales later summarized this sequence of events by stating that the two cruisers "pulled in" at "about the same time" and arrived at the defendant's location in the middle of the lot at approximately the same time.

Lawlor's testimony was consistent with that of Morales on this point. He testified that when he and Morales entered the lot from Capitol Avenue, the defendant immediately turned and started to walk away, and that Mercado entered the lot from Madison Avenue "shortly thereafter."

The trial court found, however, that "[t]he two officers and . . . Mercado entered the parking lot *at the same time* and through the only two entrances into the eatery's parking lot. . . . As soon as the two officers arrived . . . the defendant started to immediately walk away from the officers . . . ." (Emphasis added.) Because the police report, Morales, and Lawlor all indicated that Morales and Lawlor entered the lot from Capitol Avenue shortly *before* Mercado entered from Madison Avenue, and the record contains no evidence to the contrary, we must understand the court's finding that the two cruisers entered at the same time to mean that the two cruisers arrived at the lot at *approximately* the same time, and that, as the defendant began to walk away from the first cruiser, Mercado entered and the two simultaneously converged on his position in the middle of the lot.

Second, with respect to when the defendant was stopped, Morales' testimony was again consistent with the police report. In response to direct questioning by the trial court to clarify the sequence of events, Morales indicated that Mercado made the first contact with the defendant as he attempted to walk away from the cruiser driven by Morales and Lawlor, and that Mercado stopped the defendant "[b]y verbally commanding him to stop." Morales indicated that Mercado also "might have been" the one who began to question the defendant after he was stopped, although Morales was unsure.

Lawlor testified that it was Morales who "made contact with [the defendant] first," spoke to the defendant, and "handl[ed] more of the contact," while Lawlor himself observed the interaction. During that portion of the suppression hearing, however, Lawlor was not asked—and did not testify—about Mercado's role in the stopping and questioning of the defendant. Lawlor also did

not testify as to how the defendant came to be stopped when he began to walk away from the first cruiser, and the trial court made no findings in this regard.

Third, the record contains three accounts of the defendant's nervous hand movements. The police report states that, after Mercado stopped the defendant and he denied having robbed anyone, "[the defendant] kept moving his hands around in a nervous manner and yelling 'this is embarrassing!' while continuing to state his innocence." Morales offered a far more detailed account at the suppression hearing. He testified that, after the officers exited their cars and the defendant denied having robbed anyone, and as the three officers approached him on foot, the defendant moved his hands in a nervous manner while he stood facing the officers, and repeatedly stated that he felt embarrassed.[7] These hand movements entailed "going on the side, behind him fixing his pants," and were accompanied by complaints about a bad back. Morales variously described these movements as "tussling with his pants"; "tussling with his belt buckle . . . the belt area of his pants"; and "fidgeting with his hands . . . moving his belt, his upper part of the pants . . . ." Morales testified that when the officers then ordered the defendant to keep his hands where the officers could see them, the defendant refused to comply with those orders, which led the officers to pat him down for their safety. Lawlor, by contrast, testified without elaboration that the defendant moved his hands toward his waistband at the outset, as he turned to walk away from the approaching patrol car.

The trial court found on this question that, "as the defendant started to immediately walk away from the officers, he was observed by . . . Morales and . . . Lawlor to engage in movements around his waistband as he walked. While the police exited their vehicles and approached the defendant, he spontaneously yelled out 'I didn't rob anyone' and he kept saying that he was embarrassed." Although there was no evidence in the record to support the court's finding that *Morales* witnessed suspicious hand motions at the outset, while the officers were still in their vehicle pulling into the lot, the court was free to credit *Lawlor's* testimony that *he* witnessed such motions at that time. The court made no findings with respect to Morales' testimony that the defendant later defied the officers' commands to keep his hands in plain view, after the officers had stopped him.

In any event, it is clear that, soon after they entered the lot, exited their cruisers, and approached the defendant, the officers decided to pat the defendant down for their safety. Although they testified that they were concerned that he might have been carrying a weapon, the only fact they were able to articulate in support of that concern was that the defendant moved his hands

near his waistband as he turned away from them. In fact, the officers did not find any weapons on the defendant when they frisked him. They did discover a bundle containing heroin, however, and arrested him.

The defendant moved to suppress the narcotics evidence, contending that its discovery was the fruit of an illegal search and seizure, in violation of the state and federal constitutions. The trial court denied the defendant's motion and the defendant subsequently entered a plea of nolo contendere to the counts of possession of narcotics with intent to sell and failure to appear in the first degree, conditional on his right to appeal the denial of his motion to suppress pursuant to General Statutes § 54-94a. Consistent with the plea agreement, the court, *Arnold*, *J.*, imposed a total effective sentence of ten years imprisonment, execution suspended after four years, and three years probation.

The defendant appealed to the Appellate Court, arguing that he was seized when the police converged on him in the Subway parking lot or, at the very latest, when Mercado commanded him stop. *State* v. *Edmonds*, supra, 151 Conn. App. 766. The defendant further argued that at neither of those times did the police possess a reasonable and articulable suspicion that he was involved in criminal activity, as required to justify a nonarrest seizure under *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *State* v. *Edmonds*, supra, 766. The Appellate Court rejected the defendant's claim that he was seized at the outset, when the officers converged on him in the Subway lot. Id., 772–73. The court also concluded that (1) the defendant had not preserved his claim that Mercado's verbal command to stop constituted a seizure, and (2) the record was inadequate to review that claim under the test for the review of unpreserved constitutional claims that we established in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] *State* v. *Edmonds*, supra, 769–71. Accordingly, the Appellate Court upheld the trial court's implicit finding that the defendant was not seized until Morales performed the patdown search. Id., 773. Finally, the Appellate Court concluded that, at that time, the police had a reasonable and articulable suspicion sufficient to detain and frisk the defendant. Id., 775. Accordingly, the court affirmed the judgment of the trial court. Id., 776. We granted the defendant's petition for certification and this appeal followed. See footnote 1 of this opinion. Additional facts and procedural history will be set forth as necessary.

In part I of this opinion, we consider whether the Appellate Court properly concluded that the defendant was not seized until the officers patted him down for weapons and that certain of his claims in that regard are unreviewable. In part II, we consider whether, at the time of the defendant's seizure, the police officers possessed a reasonable and articulable suspicion of

criminal activity, whether the purpose of the seizure was reasonable, and whether the scope and character of the seizure was reasonable in light of its purpose.

## I

"[W]hen considering the validity of a . . . [*Terry*] stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officers] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officers] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 516, 903 A.2d 169 (2006). With respect to the former inquiry, the defendant argues that he was seized at the moment the two marked police cruisers converged on him from opposite directions in the small Subway parking lot, and no later than the time at which Mercado commanded him to stop. The state, by contrast, contends that the Appellate Court properly affirmed the implicit conclusion of the trial court that the defendant was not seized until the officers patted him down for weapons. We agree that the defendant was seized no later than when Mercado commanded him to stop.[9]

## A

We begin by setting forth the legal test used to determine when a person is seized for purposes of the federal and state constitutions.[10] "[A] person is seized when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . The key consideration is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . The inquiry is objective, focusing on a reasonable person's probable reaction to the [officers'] conduct." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Burroughs*, supra, 288 Conn. 844–46; accord *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). In situations in which the police have not applied any physical force, we must conduct "a careful [fact intensive] examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority . . . ." *State* v. *Burroughs*, supra, 846.

Factors to be considered in determining whether police conduct projects coercion include, but are not limited to: the number of officers and vehicles involved; whether the officers are uniformed; whether the officers are visibly armed or have their weapons drawn; whether the vehicles involved are marked police cruisers, whether the vehicles' sirens and emergency lights are activated, and whether the vehicles' headlamps or

spotlights illuminate the defendant; whether the defendant is alone or otherwise appears to be the target of police attention; the nature of the location, including whether it is public or private property; whether the defendant is surrounded or fully or partially blocked in by the police; the character of any verbal communications or commands issued by the police officers; whether the officers advise the detainee of his right to terminate the encounter; the nature of any physical contact; whether the officers pursue after an initial attempt by the defendant to leave; whether the officers take and retain possession of the defendant's papers or property; and any other circumstance or conduct that bespeaks aggressiveness or a show of force on the part of the police, or suggests that the defendant is under suspicion or otherwise not free to leave. See *United States* v. *Griffith*, 533 F.3d 979, 983 (8th Cir. 2008); *State* v. *Burroughs*, supra, 288 Conn. 846–47; *State* v. *Thomas*, 291 Kan. 676, 683, 246 P.3d 678 (2011); 4 W. LaFave, Search and Seizure (5th Ed. 2012) §§ 9.2 (a) and 9.4 (a). Although it is true that "not all personal intercourse between [the police] and citizens involves seizures of persons"; (internal quotation marks omitted) *Immigration & Naturalization Service* v. *Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984); and that law enforcement officers must be free to engage in "healthy, mutually beneficial intercourse with the public"; *State* v. *Burroughs*, supra, 853; it is equally true that use of coercion beyond that inherent in any police-citizen encounter transforms these sorts of informal, voluntary interactions into seizures. 4 W. LaFave, supra, § 9.4 (a), p. 601.

B

In support of its conclusion that the defendant was not seized until the officers frisked him for weapons, the Appellate Court offered the following analysis: "The facts found by [the trial court] and our independent review of the record demonstrate nothing more than a benign police presence in the Subway parking lot. The court's oral decision portrays an unremarkable scene of three uniformed officers approaching the defendant as part of a routine investigation to obtain identification and determine his purpose for being in the lot. In addition to the facts set forth in the court's oral decision, the record does not contain any evidence suggestive of threatening or coercive police conduct. For instance, there is no evidence that the police engaged their lights or sirens when they entered the Subway parking lot, that they brandished their weapons, or that they impeded the defendant's ability to move, either physically or verbally. . . . We conclude, therefore, that the defendant was not seized when the police approached him because a reasonable person in the defendant's position would not have believed that it was impermissible to leave the scene." (Citations omitted.) *State* v. *Edmonds*, supra, 151 Conn. App. 772–73.

Our own independent review of the record reveals anything but an unremarkable instance of benign community-police dialogue. On the contrary, we do not believe that any reasonable person, finding himself or herself in the position of the defendant, would have felt free to simply disregard the approaching officers and leave the scene. Numerous circumstances of the present case support this conclusion.

From the perspective of the defendant, the incident began when two police cruisers suddenly converged on him from opposite directions, effectively blocking off his only means of egress from the small Subway parking lot. It is well established that, when law enforcement officials block a suspect's vehicle so as to prevent him from driving off, they have, by that fact alone, executed a fourth amendment seizure. See, e.g., *Pane* v. *Gramaglia*, 509 Fed. Appx. 101, 103 (2d Cir. 2013) (citing authorities); *State* v. *Clark*, 297 Conn. 1, 8, 997 A.2d 461 (2010); *State* v. *Januszewski*, 182 Conn. 142, 147, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), overruled in part on other grounds by *State* v. *Hart*, 221 Conn. 595, 609, 605 A.2d 1366 (1992); 4 W. LaFave, supra, § 9.4 (a), pp. 596–97 n.122. Both this court and our sister courts have applied the same reasoning with respect to pedestrians, concluding that a seizure occurs when the police maneuver or park their vehicles, or approach a pedestrian on foot, in such a way as to block the pedestrian's path or effectively close off any avenue of escape. See, e.g., *United States* v. *Berry*, 670 F.2d 583, 597 (5th Cir. 1982) ("blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance"); *State* v. *Januszewski*, supra, 147 (pedestrian constructively seized where police blocked his vehicle from leaving parking lot); *State* v. *Allen*, Docket No. 02CA0059, 2003 WL 21276146, *3 (Ohio App. June 4, 2003) (defendant held seized where officers effectively blocked only exit from hallway), review denied, 100 Ohio St. 3d 1424, 797 N.E.2d 92 (2003); *State* v. *Ingram*, 82 Ohio App. 3d 341, 345, 612 N.E.2d 454 (1992) (seizure when two officers blocked defendant's exits from where he sat on porch railing).

We recognize that, in the present case, the officers did not fully block in the defendant, who presumably could have walked past one of the two police cruisers onto Capitol Avenue or Madison Avenue. Even under such circumstances, however, when officers have only partially blocked the available exits, courts have not hesitated to find a seizure when a reasonable person would conclude that the police have positioned their bodies or vehicles so as to effectively surround the suspect or thwart his egress. See, e.g., *United States* v. *Smith*, 794 F.3d 681, 685 (7th Cir. 2015) (pedestrian in alleyway held seized when two officers "positioned

their bicycles at a [forty-five degree] angle to him, obstructing his intended path forward"); *State* v. *Burroughs*, supra, 288 Conn. 847 (important factors include whether individual's movement was restrained or he was otherwise isolated in some manner, such as when cruiser parks in close proximity); *J.N.* v. *State*, 778 So. 2d 440, 441–42 (Fla. 2001) (pedestrian suspected of loitering held seized when exiting alley and approached on either side by three uniformed officers in marked patrol cars); *State* v. *Epperson*, 237 Kan. 707, 714, 703 P.2d 761 (1985) (suspects held seized when officer "cut off their avenue of escape" by parking cruiser so that his open car door blocked lane of travel in which suspects' vehicle was parked [internal quotation marks omitted]); *Swift* v. *State*, 393 Md. 139, 149, 156, 899 A.2d 867 (2006) (defendant walking on public road held seized when police officer pulled marked cruiser directly in front of him, "blocking his path").

Although there is no Connecticut authority directly on point, given the unique factual circumstances of the present case, *State* v. *Rustad*, Docket No. 58691-2-I, 2008 WL 555945 (Wn. App. March 3, 2008), a decision of the Washington Court of Appeals, is instructive. In that case, two officers, driving separate marked patrol cars, were responding to a "911 hang-up call" from a " 'known drug house' " at approximately 10:30 p.m. when they noticed a suspicious vehicle begin to turn into that home's driveway. Id., *1. When the officers shined their flashlights at the vehicle, it instead continued down the street. Id. The officers then spotted that same vehicle in the rear of a nearby parking lot. Id. The officers entered the lot and parked thirty to forty feet away from the vehicle, near the only road providing entry to or exit from the area, and partially blocking that exit. Id. Their spotlights were aimed at the vehicle, but they did not activate their emergency lights or sirens. Id. One officer then approached the passenger side of the defendant's vehicle, while his partner "stood guard at the rear of the vehicle." Id. Both officers were uniformed and armed, although their weapons remained holstered. Id., *2. Under those circumstances, the court concluded that the officers' actions constituted a seizure. Id. Specifically, the court concluded that, although the defendant was not physically detained, "a reasonable person would not feel free to leave or otherwise terminate the encounter" because the officers "largely, though not fully, blocked any exit the [defendant's vehicle] may have had from the parking area and back onto the road . . . ." Id.

Indeed, the theory that the police seize an individual when they knowingly surround him or obstruct his free passage is firmly rooted in our state constitution and federal common law. In *State* v. *Oquendo*, 223 Conn. 635, 650–51, 613 A.2d 1300 (1992), in construing article first, §§ 7 and 9, of the constitution of Connecticut, we emphasized that, at common law, "no man [could] be

restrained of his liberty; *be prevented from removing himself from place to place*, as he [chooses]; be compelled to go to a place contrary to his inclination, or be *in any way imprisoned, or confined*, unless by virtue of the express laws of the land. 1 Z. Swift, [A System of the Laws of the State of Connecticut (1795)] p. 180. . . . Moreover, *every detention or confinement of the person in any shape*, including the forcible detention of a person in the street, constituted an imprisonment." (Citation omitted; emphasis altered; internal quotation marks omitted.) A review of the case law construing certain maritime provisions of a 1790 act, which prohibited the "confine[ment of] the master of any ship or other vessel"; An Act for the Punishment of Certain Crimes against the United States, c. 9, § 12, 1 Stat. 115 (1790); makes clear that, at both the time that Chief Justice Swift wrote his two volume treatise, A System of the Laws of the State of Connecticut, in 1795 and 1796, and when the relevant provisions of the state constitution were adopted in the early nineteenth century, an individual was deemed to be illegally "confined" not only when he was physically restrained or imprisoned, but also under circumstances in which he was surrounded and thereby intimidated into believing that he could not freely move. See, e.g., *United States* v. *Huff*, 13 F. 630, 641 (C.C.W.D. Tenn. 1882), and authorities cited therein; *United States* v. *Hemmer*, 26 F. Cas. 259, 260 (C.C.D. Mass. 1825) (No. 15,345).

To the extent that the state relies on *State* v. *Benton*, 304 Conn. 838, 43 A.3d 619 (2012), and *State* v. *Burroughs*, supra, 288 Conn. 836, for the proposition that blocking in or surrounding a defendant does not support a finding of seizure, that reliance is misplaced. In *Benton*, three young males suspected of possible involvement in gang related violence were riding their bicycles on a public street in New Haven. *State* v. *Benton*, supra, 841. Two officers on foot patrol stepped into the road approximately twenty to twenty-five feet ahead of the three cyclists. Id. At that point, the defendant's two companions reversed direction and rode off. Id. The defendant also veered away and attempted to pedal off, but the officers physically apprehended him. Id. In concluding that the officers had not seized the defendant at the moment they initially stepped into the road, we relied on the facts that (1) the officers entered the road twenty to twenty-five feet away from the defendant, (2) they occupied less than one quarter of the two lane road, and (3) they stepped into the road in such a way as to indicate that they might merely have intended to advertise a police presence, or to observe the cyclists, rather than to stop them. Id., 845–47. In addition, the fact that both of the defendant's companions decided to ride off in another direction, and did so, indicated that they were not in fact blocked in by the officers' conduct. See id., 841. Accordingly, *Benton* is readily distinguishable from the present case, in

which the arrival of a *second* police presence, from the opposite direction, closing off the only available means of egress from the lot, thwarted the defendant's initial attempt to walk away from Morales and Lawlor as they approached him.

*Burroughs* provides even weaker authority for the state's position, because in that case the police did nothing whatsoever to discourage or hinder the defendant from leaving the scene. In *Burroughs*, a single police cruiser pulled up *behind* a vehicle that was parked at night in an industrial area, without activating the cruiser's emergency lights or sirens. *State* v. *Burroughs*, supra, 288 Conn. 840, 852. Two officers exited the cruiser and walked up to the driver's and passenger's sides of the parked vehicle to determine whether the occupants needed assistance. Id. Under those circumstances, we concluded that there was no significant show of police authority sufficient to indicate that the defendant and his passenger were not free to leave. Id., 851–52. Importantly, nothing barred the defendant in *Burroughs* from simply driving off in the direction his vehicle was facing. By contrast, if a second police cruiser had entered the scene and pulled *in front* of the defendant's vehicle, boxing him in, he would not have been free to leave. That is precisely what happened here.

Beyond the fact that two marked police cruisers converged on the defendant from opposite directions, effectively blocking him from exiting the lot, several other aspects of the present case would indicate to a reasonable person in the defendant's position that he was not free to leave. First, the defendant was the only person in the parking lot at the time the police entered. Whereas an individual standing in a crowded area or traveling a public road has no reason to assume that a sudden police presence is directed toward him, in the present case it would have been apparent to the defendant that the two cruisers and three officers who suddenly approached were there for him. See *State* v. *Oquendo*, supra, 223 Conn. 653. Second, and relatedly, it is important that the Subway lot was private property, where police would not be expected to routinely patrol. See *Parker* v. *Commonwealth*, 255 Va. 96, 102, 496 S.E.2d 47 (1998).

A third, critical consideration is the fact that, as the defendant turned to walk away from the marked police cruiser driven by Morales and Lawlor, he was confronted by a second cruiser, driven by Mercado, which had entered from the opposite direction, appearing to thwart his passage. There is a common trope in espionage and other action genre films in which the protagonist turns to retreat upon confronting an enemy, only to see more would-be captors appear from the other direction. At that point, he, along with the audience, realizes that he is trapped. Both courts and commenta-

tors have applied this basic intuition in the search and seizure context, recognizing that cornering or "pursuing a person who has attempted to terminate the contact by departing" sends a clear signal that the person is not free to leave. 4 W. LaFave, supra, § 9.4 (a), p. 586; see, e.g., *United States* v. *Beauchamp*, 659 F.3d 560, 566–67 (6th Cir. 2011); *In re D.J.*, 532 A.2d 138, 141 (D.C. App. 1987), abrogated for federal constitutional purposes by *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991); *Commonwealth* v. *Depina*, 456 Mass. 238, 242, 922 N.E.2d 778 (2010); *Commonwealth* v. *Lewis*, 535 Pa. 501, 506, 509, 636 A.2d 619 (1994); *Parker* v. *Commonwealth*, supra, 255 Va. 102.

Other factors that would have indicated to a reasonable person in the defendant's position that he was not free to leave were the fact that he was approached by multiple uniformed police officers; see *State* v. *Benton*, supra, 304 Conn. 846; driving multiple marked patrol cars; see *State* v. *Burroughs*, supra, 288 Conn. 847; in a dark, unlit space. See *United States* v. *Smith*, supra, 794 F.3d 685. Moreover, although there is no indication whether the cruisers' sirens and emergency lights were activated, we must at least assume, because the incident occurred approximately two hours after sunset, that the officers had illuminated their headlamps, and, therefore, that the defendant would have been illuminated in the glare of those headlamps as the cruisers approached him in the unlit lot. See *Commonwealth* v. *Helme*, 399 Mass. 298, 303, 503 N.E.2d 1287 (1987); *State* v. *Pierce*, 173 Vt. 151, 153, 787 A.2d 1284 (2001). These factors, therefore, further support the conclusion that a reasonable person, standing alone in a dark and private parking lot, who suddenly found himself blocked in by marked police cruisers, would not have felt free to leave.

Lastly, if we had any remaining doubt as to whether a reasonable person in the defendant's position would have felt free to disregard the three officers and leave the scene as they approached, those doubts are dispelled by the fact that Mercado, upon entering the Subway lot, commanded the defendant to stop. As a result of this command, the defendant, who initially sought to turn away from the first cruiser driven by Lawlor and Morales, stopped and submitted to police authority.

It is well settled that a reasonable citizen would not feel free to disregard a verbal command to stop issued by an armed, uniformed police officer. See *State* v. *Benton*, supra, 304 Conn. 844 n.4 (state conceded that police officer's command to stop constitutes seizure for purposes of state constitution); *State* v. *Oquendo*, supra, 223 Conn. 647–48 n.8 (similar); *State* v. *Williamson*, 10 Conn. App. 532, 540, 524 A.2d 655 (order to halt, standing alone, constituted seizure), cert. denied, 204 Conn. 801, 525 A.2d 965 (1987); see also *United States*

v. *Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (command to halt is example of police conduct that conveys to reasonable person that he is not free to leave); *In re Martin H.*, Docket No. B151148, 2002 WL 1732650, *3 (Cal. App. July 25, 2002) ("when an officer commands a citizen to stop, this constitutes a detention because the citizen is no longer free to leave" [internal quotation marks omitted]); *Blake* v. *State*, 939 So. 2d 192, 195 (Fla. App. 2006) ("[i]f . . . the officer phrases his or her inquiries as commands, this action would indicate that the individual was not free to leave"); M. Raymond, "The Right to Refuse and the Obligation to Comply: Challenging the Gamesmanship Model of Criminal Procedure," 54 Buff. L. Rev. 1483, 1493 (2007) ("[P]olice commands or orders create seizures. The quintessential command is the order to stop . . . ." [Footnotes omitted.]). Accordingly, having considered all of the relevant circumstances and all of the undisputed evidence in the record, we are compelled to conclude that a reasonable person in the defendant's position would not have felt free to leave the scene, and that the defendant was seized no later than when Mercado successfully commanded him to stop.

C

We next consider the state's assertion, which the Appellate Court found persuasive, that the defendant's claim that he was seized no later than when Mercado commanded him to stop is unreviewable on appeal. The state contends that we must determine either that the defendant was seized at the outset, when the officers converged on him in the middle of the parking lot, or later, when they patted him down for weapons. We disagree, and conclude that the defendant's full argument is preserved for appellate review and that we are not barred from considering any of the undisputed testimony in the record.

The following additional procedural history is relevant to our evaluation of the state's argument. The defendant filed with the trial court what fairly may be characterized as a boilerplate motion to suppress evidence. The motion alleged only that: (1) "certain items seized by law enforcement officer(s) or his agent(s) . . . were not seized pursuant to a search and seizure warrant"; and (2) "[t]he search and seizure violated the laws and constitutions of the United States and of the [s]tate of Connecticut in that . . . [t]he search and seizure was unreasonable." No memorandum of law setting forth specific legal theories or arguments accompanied the motion, and the state neither filed an objection to the motion nor sought any clarification or specification as to the grounds or theories on which the defendant objected to the search and seizure. In fact, neither party presented its theory of the seizure issue prior to the opening of testimony at the suppression hearing.

At the suppression hearing, the state proceeded first with its case, consistent with its burden of proving that the officers' warrantless search and seizure of the defendant was constitutional. See *State* v. *Eady*, 249 Conn. 431, 436, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999). The state called and examined two witnesses—Officers Morales and Lawlor—whom defense counsel cross-examined broadly about the circumstances surrounding the defendant's arrest. The prosecutor indicated that he had intended to call Sergeant Mercado as well, but that Mercado was on vacation in Florida and, therefore, unavailable to testify.

When the prosecutor completed his redirect questioning of Morales, the trial court intervened to ask the officer a series of questions to clarify the timeline of events. The court specifically asked Morales one-half dozen questions about the circumstances under which Mercado had stopped the defendant from walking away, and twice asked Morales to confirm that Mercado did so by verbally commanding the defendant to stop. After questioning Morales in this area, the court gave the prosecutor an opportunity to ask Morales follow-up questions.

After the state rested, the defendant briefly called one witness to establish a lack of recent criminal activity at the Subway in question. The court then invited the state to present its closing argument, and the prosecutor for the first time offered the state's theory of the search and seizure. It was only then, at the very end of the hearing, after the witnesses had been excused, both sides had rested, and the state had presented its argument, that the court invited defense counsel to argue her theory of the case.

Defense counsel began by advising the court that the court's primary duty was to determine when the defendant was seized, if at all. At varying times, she argued that the defendant was seized: (1) when the police cruisers surrounded him in the lot; (2) when the three officers exited their cruisers and approached the defendant; or (3) when the police patted him down. At other times, however, defense counsel framed the issue more broadly. Near the end of the hearing, for example, she argued that the "bottom line" was that the defendant "was seized the minute that those police officers turned around and did a U-turn, came into the parking lot *and stopped* [*the defendant*] . . . ." (Emphasis added.)

Despite the fact that defense counsel correctly advised the trial court that the court was obliged to determine whether a seizure occurred between the time that the officers entered the lot and when they verbally stopped the defendant, the trial court made no express findings in that regard. Instead, the court appears to have assumed that the frisk was the event of constitu-

tional significance, and to have concluded that a seizure was justified at that time.

On appeal, the state argues that (1) the defendant failed to preserve his argument that a seizure occurred when Mercado commanded the defendant to stop, (2) the record is inadequate for us to review this allegedly unpreserved claim, and (3) the state relied to its detriment on the fact that the defendant opted not to raise this argument at the suppression hearing. All of the state's arguments are without merit.

First, we disagree with the conclusion of the Appellate Court that the defendant's claim that he was seized no later than when Mercado commanded him to stop is unpreserved and, therefore, can only be reviewed on appeal if it satisfies the *Golding* test. *State* v. *Edmonds*, supra, 151 Conn. App. 770. At the suppression hearing, defense counsel advised the trial court that it must determine precisely when the defendant was seized. Counsel, who did not bear the burden of proof on this issue and had just heard the officers' account of the events in question for the first time, offered three specific possibilities, ranging from the moment the officers entered the lot to the moment they approached the defendant on foot to the moment they frisked him. But defense counsel also argued that the constitutionally relevant time period was of longer duration: the "minute" during which the officers turned around, entered the lot, and "stopped" the defendant. Because the only explicit testimony as to how the defendant was stopped was Morales' testimony that Mercado verbally commanded him to stop, we have no difficulty concluding that that command is fairly encompassed by the seizure theory that defense counsel articulated at the suppression hearing.[11] As the Appellate Court has recognized, "[c]losing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. . . . [S]ome leeway must be afforded to the advocates in offering arguments . . . ." (Internal quotation marks omitted.) *State* v. *McCleese*, 94 Conn. App. 510, 517–18, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006).

Second, even if we agreed that the defendant's argument is unpreserved, we would disagree with the state—and the Appellate Court—that the record is inadequate to review that argument. The state contends that the record is inadequate because: (1) the trial court made no express findings with respect to Mercado's verbal command to stop; and (2) the testimony of Morales and Lawlor as to this point allegedly conflicts. The first contention is of little moment, as it is well established that, when reviewing the constitutionality of an alleged seizure, we must parse the entire record, and not only the trial court's express findings. *State* v. *Burroughs*, supra, 288 Conn. 843–44. If there is uncon-

tested testimony by the state's own witness indicating that Mercado seized the defendant before the defendant made any incriminating statements, and if the trial court did not affirmatively decline to credit that testimony, then it is fairly considered in the context of a constitutional analysis. This is especially true in light of the fact that the trial court clearly failed to focus on the constitutional import of *any* of the events that transpired prior to the patdown, suggesting that we can read little into the court's failure to make express findings with respect to those events.

The primary question, therefore, is whether Morales' testimony on this point is uncontested. Morales clearly testified, on multiple occasions, that it was Mercado who "stopped" the defendant. The police incident report—which Morales authored, for which Lawlor provided assistance, and which an unidentified supervisor reviewed and signed[12]—is in full agreement, stating that "when the [defendant] turned away from us when he observed our patrol unit . . . Mercado drove in from the Madison [Avenue] entrance and stopped [him] . . . ." The trial court itself questioned Morales at some length to clarify this testimony. In response, Morales specified that Mercado verbally commanded the defendant to stop.

For his part, Lawlor testified only that Mercado arrived shortly after Morales and he entered the lot, and that he could not recall where Mercado had parked. He gave no indication of what role Mercado played in the incident, if any, nor whether Mercado spoke to the defendant or issued any commands. When asked whether all three officers approached the defendant, Lawlor replied: "I don't recall at what specific time but we approached him." Nothing in Lawlor's testimony, then, directly contradicted Morales' testimony that Mercado ordered the defendant to stop as, or before, the defendant made any incriminating statements.

In fact, the state's argument that Lawlor offered conflicting testimony is based entirely on the following brief colloquy between the prosecutor and Lawlor:

"Q. Okay. Now, when you exited the vehicle did you make contact with the individual that was hanging out in back of the Subway?

"A. Well, contact was made.

"Q. By who?

"A. By—Officer Morales made contact with him first.

"Q. Okay. And then who made contact with him second?

"A. I was there, but Officer Morales was handling more of the contact first.

"Q. So is it a fair assessment to say that Officer Morales spoke to the individual and you just kind of

observed what was going on?

"A. Yes."

During this colloquy, no mention is made of Mercado and, in particular, there is no discussion of any role that Mercado might have played before Morales and Lawlor exited their vehicle. In fact, Lawlor's entire testimony during this portion of the hearing is limited to the roles that *he and Morales* played in the events in question, and he is not asked about Mercado's role until much later. In context, then, there simply is no reason to interpret Lawlor's brief reference to the fact that, after he and Morales exited their vehicle, Morales made the first contact with the defendant, to mean that Lawlor disagreed with Morales' testimony that Mercado initiated the stop. Indeed, the failure of either party to seek clarification of Lawlor's testimony as to this point suggests that this testimony was not interpreted to conflict with Mercado's testimony or with the officers' incident report. The most reasonable reading of the testimony, therefore, is that Lawlor was merely indicating that, of the two partners, it was Morales who interacted with the defendant. Accordingly, we are not precluded from considering Morales' uncontradicted testimony with respect to the time of seizure.

Third, we are not persuaded by the argument that the state relied to its detriment on a belief that Mercado's verbal command to stop was not relevant to the case. As we already have explained, that issue clearly was raised at the suppression hearing. The trial court, sua sponte, questioned Morales about the command at some length, and afforded the prosecutor an opportunity to pursue the issue on redirect. Defense counsel later argued that the "bottom line" was that the defendant was seized during the minute in which the officers stopped the defendant. That the state opted to largely ignore the constitutional significance of the period during which the officers entered the lot and confronted the defendant, and instead focused almost exclusively on the reasonableness of the patdown search, was a strategic decision, and not the result of trial by ambuscade.

Nor is there any indication that the state declined to call Mercado as a witness out of a belief that his role in the encounter was somehow irrelevant. Rather, the prosecutor indicated at the suppression hearing that he had intended to call Mercado as a witness but that Mercado was on vacation in Florida at the time. Accordingly, we reject the state's argument that, in determining when the defendant was seized, we may not consider the undisputed testimony of the state's own witness, as corroborated by the officers' official incident report, that Mercado, upon entering the parking lot, restrained the defendant by issuing a verbal command to stop.

II

Having concluded that the defendant was seized no later than when Mercado commanded him to stop, we next consider whether the seizure was legal. It is well settled that a *Terry* stop is constitutionally permissible only if three conditions are met: "(1) the officer[s] must have a reasonable suspicion that a crime has occurred, is occurring, or is about to occur; (2) the purpose of the stop must be reasonable; and (3) the scope and character of the detention must be reasonable when considered in light of its purpose." *State* v. *Cyrus*, 297 Conn. 829, 837, 1 A.3d 59 (2010); see also *United States* v. *Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. . . . [That] is the central teaching of this [c]ourt's [f]ourth [a]mendment jurisprudence." [Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.]). For an officer's suspicion of criminal activity to be objectively reasonable, the officer "must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Cyrus*, supra, 838. In the present case, we agree with the conclusion of the trial court that, from the time Morales and Lawlor first observed the defendant standing in the Subway lot until they and Mercado converged on his location, the officers had no reasonable, articulable suspicion that he was engaged in criminal conduct. We further conclude that the two additional factors that arose as the officers were approaching—that the defendant turned to walk away, and that his hands moved near his waist as he did so—also do not support a reasonable and articulable suspicion of criminal activity. Accordingly, we conclude that the warrantless seizure was illegal.

It is undisputed that, prior to the time the officers entered the lot to question the defendant, he did not make any suspicious statements or nervous gestures. He was just standing outside at night. It is well established that the fact that a citizen chooses to stand outside at the dinner hour, in a neighborhood plagued by crime, does not warrant any reasonable and articulable suspicion that he himself is engaged in criminal activity. See *State* v. *Santos*, 267 Conn. 495, 508–509, 838 A.2d 981 (2004) (presence of individual in high crime area at night not sufficient to justify seizure), abrogated on other grounds by *State* v. *Burroughs*, 288 Conn. 836, 844 n.5, 955 A.2d 43 (2008); *State* v. *Hammond*, 257 Conn. 610, 625, 778 A.2d 108 (2001) (relying on *United States* v. *Gray*, 213 F.3d 998, 1001 [8th Cir. 2000], for proposition that standing on street in high crime area before 10 p.m. in cold weather insufficient to justify *Terry* stop); see also *United States* v. *Blair*, 524 F.3d 740, 751 (6th Cir. 2008) (10:30 p.m. is "not late enough

to arouse suspicion of criminal activity," even in high crime area); *People* v. *Bower*, 24 Cal. 3d 638, 645, 597 P.2d 115, 156 Cal. Rptr. 856 (1979) (time of 8:37 p.m., "while falling during darkness in winter, is simply not a late or unusual hour nor one from which any inference of criminality may be drawn"); *People* v. *Bower*, supra, 645 (cautioning that "high crime area justification is easily subject to abuse" [internal quotation marks omitted]); *Commonwealth* v. *Helme*, supra, 399 Mass. 298, 302 (stop not justified where defendant's car was parked with interior lights on and engine running at 12:30 a.m. in parking lot outside pub that was open for business). Compare 4 W. LaFave, supra, § 9.5 (e), pp. 691–92 (not suspicious for individual to stand outside residential or commercial establishment in evening), with id., p. 688 n.180 (listing cases finding reasonable suspicion that suspect was casing for possible burglary where suspicious conduct took place after midnight outside closed or abandoned establishments), and id., § 9.5 (g), p. 741 n.346 (similar). Quite simply, "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity." (Internal quotation marks omitted.) *United States* v. *Gray*, supra, 213 F.3d 1001.

Nor does standing in a private lot for a few seconds constitute loitering, particularly without any indication that the person is engaged in otherwise improper conduct or has been asked to leave the premises. See Bridgeport Municipal Code § 9.04.010; see also *Wainwright* v. *New Orleans*, 392 U.S. 598, 604, 88 S. Ct. 2243, 20 L. Ed. 2d 1322 (1968) (Warren, C. J., dissenting from dismissal of writ of certification as improvidently granted); *United States* v. *James*, 62 F. Supp. 3d 605, 612 (E.D. Mich. 2014); *State* v. *Grace*, 28 Kan. App. 2d 452, 459, 17 P.3d 951 (2001).

In the present case, Morales and Lawlor saw an otherwise nondescript man—if they could even discern that the vague "silhouette" they saw was male—standing outside a restaurant and apartment building for a few seconds at 7 p.m., in a city with a generally high crime rate. This particular location had not reported any criminal activity for at least the prior four months, and no incidents had been reported in the area that evening. There are 1001 legitimate reasons why a man might pause for a moment outside an open eatery at the dinner hour. He might have been meeting friends, family, or colleagues for supper; waiting for his children to come out of the restroom; reviewing the menu; checking to see if a friend was inside; pondering whether he was in the mood for sandwiches or fish; taking a smoke break; making a private call; or just getting a breath of fresh air. This was not a case where the defendant looked into a store window one dozen times without entering; see *Terry* v. *Ohio*, supra, 392 U.S. 6; staked out a store for an extended period of time, from an unusual location; see *State* v. *Thurlow*, 485 A.2d 960,

963 (Me. 1984); or paid particular attention to a store's cash registers. See *Mosley* v. *State*, 289 Md. 571, 572, 425 A.2d 1039 (1981). Quite simply, the officers were unable to articulate anything remarkable, let alone suspicious, about *this particular individual* that would differentiate him from any of the myriad other citizens who might have paused for a moment in any residential or commercial area of Bridgeport that evening, or that would suggest that he was preparing to commit a crime. As Justice Glass explained in his dissenting opinion in *State* v. *Cofield*, 220 Conn. 38, 50, 595 A.2d 1349 (1991), "[m]any of our less fortunate citizens are forced to establish their homes in or near locales of criminal repute, or they travel to such places to call upon friends or engage in an infinite range of innocuous human activities. . . . [T]he crime rate of a particular area cannot transform otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual." (Citation omitted; internal quotation marks omitted.)

In fact, the defendant's conduct in this case was far less suspicious than conduct that has been held to be insufficient, as a matter of law, to justify a seizure. In *State* v. *Donahue*, 251 Conn. 636, 639, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), for example, the police observed an individual idle his car at 1:50 a.m. in a vacant lot outside a closed social club, on a street that " 'had experienced a dramatic increase in criminal activity in the previous four to six weeks . . . .' " Notwithstanding that " '[i]ndividuals would often park their vehicles at the commercial establishments along [that particular street] and then walk through [a] cemetery into [a] housing project to engage in [drug dealing and prostitution]' "; id.; we concluded that the circumstances did not give rise to a reasonable and articulable suspicion of criminal activity. Id., 648. Allowing the police to execute a seizure without any information linking that particular individual to any particular crime, we reasoned, would permit law enforcement to improperly profile entire neighborhoods and communities as criminal. Id., 648 and n.11. "This court," we concluded, "cannot permit such a suspension of constitutional protections." Id., 648.

Looking to other jurisdictions, the most similar case to the present case appears to be *People* v. *Revoal*, 269 P.3d 1238 (Colo. 2012) (en banc). In that case, the police observed an individual standing outside a closed Subway shop at 11:30 p.m., in an area that had experienced a recent history of robberies. Id., 1239. They observed the individual look to the left and to the right, as if watching for something, and then walk to a dark area across the lot, behind an open liquor store. Id. When he saw their patrol car approaching, the individual turned and walked in the opposite direction. Id. Considering all of these circumstances, the Supreme Court of

Colorado unanimously concluded that the officers did not have a reasonable suspicion sufficient to justify an investigatory stop. Id. In the present case, under circumstances even less suspicious than those in *Revoal* and *Donahue*, we likewise conclude that there was no legitimate reason for Morales, Lawlor, and Mercado to seize the defendant at the time they entered the Subway lot.

The only events of potential constitutional significance that transpired between the time the two cruisers entered the lot and the time that Mercado successfully commanded the defendant to stop are: (1) the fact that the defendant turned to leave when the police arrived; and (2) the fact that the defendant's hand moved near his waistband as he turned. These factors, taken together with those previously discussed, also do not provide sufficiently specific grounds to support a reasonable conclusion that the defendant was involved in criminal activity.

First, the fact that the defendant turned to walk away when he saw Morales and Lawlor driving into the Subway lot does not suggest that he was up to something nefarious. It is true that an individual's "[h]eadlong flight" upon perceiving police may justify a *Terry* stop. *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); accord *State* v. *Middleton*, 170 Conn. 601, 605, 368 A.2d 66 (1976). The mere fact that a citizen turns and *walks* away from an approaching police officer does not, however, support a reasonable and articulable suspicion of criminality. *State* v. *Hammond*, supra, 257 Conn. 625; see also *United States* v. *Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009) (stating federal rule), cert. denied, 559 U.S. 1044, 130 S. Ct. 2081, 176 L. Ed. 2d 428 (2010); *State* v. *Milotte*, 95 Conn. App. 616, 617, 897 A.2d 683 (2006) (fact that defendant, in area where driving under influence arrests are common, appeared to drive so as to avoid police officer held too speculative to justify *Terry* stop), appeal dismissed, 281 Conn. 612, 917 A.2d 25 (2007); *State* v. *Hicks*, 241 Neb. 357, 362, 488 N.W.2d 359 (1992) (majority rule among states is that citizens may avoid or retreat from police presence without creating reasonable suspicion of criminality). We have recognized that "merely veering off course may be a wholly appropriate response to the sudden appearance of police officers in the roadway and is consistent with going about one's business . . . ." (Internal quotation marks omitted.) *State* v. *Benton*, supra, 304 Conn. 850. In the present case, not only did the defendant not flee *headlong* from the officers, but he did not flee at all; Morales even rejected the suggestion that the defendant had walked away "quickly."

There are a number of legitimate reasons why a law-abiding citizen may not desire to remain on the scene when the police appear, especially in a dangerous neigh-

borhood where police-citizen relations may be strained. See *Alberty* v. *United States*, 162 U.S. 499, 511, 16 S. Ct. 864, 40 L. Ed. 1051 (1896) (noting that, as matter of common knowledge, people who are entirely innocent may seek to depart crime scene due to fear of being mistakenly apprehended or unwillingness to appear as witnesses). As Justice Stevens elaborated in his concurring and dissenting opinion in *Illinois* v. *Wardlow*, supra, 528 U.S. 131–34, "a reasonable person may conclude that an officer's sudden appearance indicates nearby criminal activity. And where there is criminal activity there is also a substantial element of danger—either from the criminal or from a confrontation between the criminal and the police. These considerations can lead to an innocent and understandable desire to quit the vicinity with all speed.

"Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. . . . [T]he evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient." (Footnotes omitted.) See also *State* v. *Hicks*, supra, 241 Neb. 363 ("[f]ear or dislike of authority, distaste for police officers based upon past experience, exaggerated fears of police brutality or harassment, and fear of unjust arrest are all legitimate motivations for avoiding the police"). It would be ironic, to say the least, if we were to rely on a defendant's *freedom* to leave as evidence that there was not a seizure but then rely on the mere exercise of that ability to conclude that there is a reasonable suspicion that justifies a seizure.

Turning to the second factor, the state contends that the fact that Lawlor saw the defendant "engage in movements around his waistband as he walked" led the officers reasonably to suspect the defendant of criminal activity. Courts and commentators have recognized, however, that the mere fact that the police report that a suspect moved his hands in the area of his waist, without further context or detail, does not justify a warrantless seizure. See *In re Jeremy P.*, 197 Md. App. 1, 14, 11 A.3d 830 (2011) (reviewing "waistband" cases from various jurisdictions and concluding that "a police officer's observation of a suspect making an adjustment in the vicinity of his waistband does not give rise to reasonable suspicion of criminal involvement sufficient to justify a *Terry* stop"). Because a typical man's hands hang only a few inches or so below his waist, under normal circumstances it is virtually impossible to turn and walk off in such a way that the hands do not appear to come into proximity thereto. Surely it cannot be the case that any man living in a high crime neighborhood

who appears to move his hands in the vicinity of his waist as the police approach, or who engages in commonplace and innocuous conduct such as briefly adjusting his pants, thereby subjects himself to search and seizure. See *Duhart* v. *United States*, 589 A.2d 895, 899–900 (D.C. 1991).

The officers in the present case did not provide the sort of detailed testimony that has been found to support a reasonable and articulable suspicion of gun possession in other cases. For example, there was no testimony describing a gun-shaped bulge in the clothing, an awkward gait or arm movement typical of those carrying concealed guns, an informant's tip that the subject was armed, or the fact that persons similarly situated to the defendant frequently carry unlicensed guns. See, e.g., *United States* v. *Parker*, 277 Fed. Appx. 48, 51 (2d Cir. 2008); *State* v. *Mann*, 271 Conn. 300, 322–26, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005); 4 W. LaFave, supra, § 9.6 (a), pp. 855–62. In fact, the officers never even testified that they actually believed the defendant was carrying a weapon. Although we have recognized a compelling interest in preserving officer safety; see *State* v. *Mangual*, 311 Conn. 182, 209–10, 85 A.3d 627 (2014); mere conclusory testimony that the officers were concerned for their safety does not constitute the sort of specific, articulable evidence necessary to justify a *Terry* stop. See *Pinnock* v. *New Haven*, 553 F. Supp. 2d 130, 141 (D. Conn. 2008).

Accordingly, while we remain cognizant of law enforcement officers' legitimate safety concerns, we cannot allow the police to invoke an individual's waistband like a talisman in order to justify any seizure after the fact. Particularly in a case such as the present one, where the facts that have been asserted as justifying an officer safety patdown—repeated fiddling with the waistband and refusal to comply with officers' orders—are almost entirely facts that the officers neglected to memorialize in their official incident report, and then claimed to remember two years later at a suppression hearing where they were unable to recall other basic details of the incident,[13] we should be extremely wary of sanctioning a seizure in the absence of truly specific and articulable evidence that the defendant was engaged in criminal conduct.

A decision of the Supreme Court of Colorado is instructive in this regard. See *People* v. *Thomas*, 660 P.2d 1272 (Colo. 1983), overruled on other grounds by *People* v. *Archuleta*, 980 P.2d 509, 515 (Colo. 1999). The facts of *Thomas* are remarkably similar to those of the present case. While stopped at a red light, police officers observed the defendant, Joseph Thomas, " 'just standing' " in the parking lot of a fast-food restaurant. Id., 1273. Upon their approach, Thomas placed his hand in his pocket, and either walked or ran across the lot

toward an adjoining building. Id., 1273–74. The court concluded that the mere fact that an individual in a high crime area makes a " 'furtive gesture' " about his clothing and quickly leaves the scene upon the arrival of law enforcement is clearly insufficient to justify a seizure. Id., 1275–76, 1276 n.2.

By contrast, our decision in *State* v. *Mann*, supra, 271 Conn. 325, on which the Appellate Court relied; *State* v. *Edmonds*, supra, 151 Conn. App. 776; is readily distinguishable. In that case, the police had specific prior information that drugs were being packaged and sold from the apartment in question. *State* v. *Mann*, supra, 323–24. Upon confronting the police at the apartment door, the defendant in that case immediately thrust his hand into his pocket. Id., 324. Under those circumstances, and given the "well established correlation between drug dealing and firearms," we concluded that there was a reasonable suspicion that the defendant was armed and posed an imminent danger to the police. (Internal quotation marks omitted.) Id., 325.

In the present case, by contrast, there was no specific and articulable basis for the officers to believe that the defendant was engaged in criminal conduct, that he was reaching for a weapon, or that they were in any immediate danger. For these reasons, we conclude that the officers' seizure of the defendant was not supported by a reasonable and articulable suspicion that he was engaged in criminal conduct and, accordingly, that his motion to suppress the narcotics evidence obtained in violation of his constitutional rights should have been granted.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court with direction to grant the defendant's motion to suppress.

In this opinion ROGERS, C. J., and PALMER, EVELEIGH and ROBINSON, Js., concurred.

[1] We granted the defendant's petition for certification to appeal limited to the following two issues: (1) "Did the Appellate Court properly determine that the record was not adequate for appellate review of the defendant's claim that he was seized when Sergeant Ronald Mercado commanded him to stop?"; and (2) "Did the Appellate Court properly determine that the defendant was not seized until police officers conducted a patdown search of the defendant's person?" *State* v. *Edmonds*, 314 Conn. 925, 100 A.3d 855 (2014). Because the certified questions are inextricably linked with the related issue of whether the officers' seizure of the defendant was reasonable, and because the defendant briefed that question extensively and the state—while declining to brief the question before this court—briefed it before the Appellate Court and argued it at oral argument before this court, we address it herein as well. See *Montoya* v. *Montoya*, 280 Conn. 605, 617 n.11, 909 A.2d 947 (2006).

[2] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[3] Article first, § 7, of the Connecticut constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

Although we have determined that, under certain circumstances, the relevant provisions of the state constitution provide broader protection from unreasonable search and seizure than does the fourth amendment; see, e.g., *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992); our analysis and resolution of the present appeal would be the same under either constitution. We recognize, however, that the defendant's claim that he was seized the moment that two police cruisers approached him from opposite directions in the parking lot, and before he was ordered to stop, is cognizable only under the constitution of Connecticut, because the United States Supreme Court has held that the fourth amendment is not implicated until a suspect actually submits to a show of authority by the police or is physically detained. *California* v. *Hodari D.*, 499 U.S. 621, 628–29, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991).

[4] Only three witnesses testified at the suppression hearing: two of the three arresting officers, and a sergeant with the Bridgeport Police Department (department) called by the defense for the limited purpose of establishing that the department's computer aided dispatch system had not recorded any incidents at the location of the defendant's arrest during the four months preceding the defendant's arrest.

[5] The court found, rather, that "[i]t was dark outside . . . ."

[6] See Time and Date AS, "Bridgeport, CT, USA—Sunrise, Sunset, and Daylength, January 2011," available at http://www.timeanddate.com/sun/usa/bridgeport?month=1&year=2011 (last visited June 1, 2016); see also *State* v. *Morris*, 47 Conn. 179, 180 (1879) ("[t]he time of the rising or setting of the sun on any given day belongs to a class of facts . . . of which courts will take judicial notice").

[7] When the trial court asked Morales whether the fidgeting hand motions occurred at the same time as the defendant professed his innocence, Morales responded ambiguously: "[n]o, I believe *that* was before." (Emphasis added.)

[8] Under *Golding*, a criminal defendant can prevail on an unpreserved claim of constitutional error if all of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*).

[9] Because we conclude, taking all of the relevant circumstances into account, that the defendant was seized without reasonable justification when Mercado commanded him to stop, we need not consider the defendant's alternative theory that he was seized at the outset, when the officers converged on his position in the center of the parking lot.

[10] See footnotes 2 and 3 of this opinion.

[11] Accordingly, this case is readily distinguishable from *State* v. *Brunetti*, 279 Conn. 39, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), in which the defendant, who had taken the lead during the suppression hearing; id., 48 n.14; and consistently argued that his father's consent to search was invalid, shifted gears on appeal and began to argue for the first time that his mother's opposition precluded a valid consent search. Id., 48–49, 53.

[12] It is unclear whether the supervisor's signature is that of Mercado or another supervisor.

[13] At the time of the suppression hearing in February, 2013, for example, Morales, who had conducted more than 500 such patdowns over the course of his career, was unclear about or unable to recall a number of significant details of the January, 2011 incident involving this particular defendant: whether there were any cars in the lot; whether he patted the defendant down on a vehicle; who transported the defendant from the scene; which officer was driving the cruiser; whether Mercado was accompanied by another officer; where Mercado parked; what statements the defendant made upon being confronted; whether the defendant was wearing a hood; the circumstances under which the defendant provided the police with two different addresses; and which officer questioned the defendant. Morales did testify, however, that he specifically recalled: the defendant tussling with his pants in the area of his waistband and belt buckle; placing his

hands behind him; fixing his pants; and ignoring the officers' commands that he keep his hands in plain view.

When Lawlor was first questioned as to what concern led to the need for an officer safety patdown, he replied only that he was concerned because the defendant initially started to walk away from the police and denied having robbed anyone. The prosecutor, however, responded by further prompting Lawlor: "[D]id the defendant make any movements with his hands at all to the best of your recollection?" Lawlor then volunteered that, in fact, the defendant had "moved them toward his waistband when he was walking away." Neither officer was able to explain why they had neglected to include these key details in their official incident report, which stated only that the defendant "kept moving his hands around in a nervous manner and yelling 'this is embarrassing!' while continuing to state his innocence."