43 A.3d 619 (2012)
304 Conn. 838
STATE of Connecticut
v.
Torrence BENTON.
No. 18850.
Supreme Court of Connecticut.
Argued March 22, 2012.
Decided May 29, 2012.
*621 David C. Warner, assistant public defender, with whom, on the brief, was Alton Burton, Jr., for the appellant (defendant).
Alexander Copp, certified legal intern, with whom were Harry Weller, senior assistant state's attorney, Laura DeLeo, assistant state's attorney, and, on the brief, Michael Dearington, state's attorney, for the appellee (state).
ROGERS, C.J., and PALMER, ZARELLA, McLACHLAN, HARPER and VERTEFEUILLE, Js.
HARPER, J.
The defendant, Torrence Benton, appeals[1] from his conviction on charges of carrying a pistol without a permit in violation of General Statutes § 29-35(a) and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c. On appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence obtained in a search incident to his arrest. Specifically, he contends that police seized him prior to his arrest without reasonable and articulable suspicion that he was engaged in criminal activity, as required by the fourth amendment of the constitution of the United States and article first, §§ 7 and 9, of the constitution of Connecticut. We disagree and conclude that the totality of the circumstances in this case furnished sufficient reasonable and articulable suspicion that the defendant was engaged in criminal activity to justify the police stopping him. Accordingly, we affirm the judgment of the trial court.
The record and the trial court's findings reveal the following undisputed facts. In April, 2010, at approximately 5:30 p.m., two uniformed New Haven police officers on foot patrol observed the defendant and two other males riding bicycles on a street in the Newhallville neighborhood of New Haven. The officers, who had been on the police force for less than two years, had *622 spent the past six months on foot patrol in the Newhallville neighborhood and were familiar with the area and its residents. The defendant, a twenty-two year old black man, was wearing red and black clothing as well as a red, black and white beaded necklace and a Cincinnati Reds baseball cap. This attire, as the officers knew, is consistent with membership in the Bloods, a criminal street gang that was in conflict with the R2 gang, then the predominant street gang in the Newhallville neighborhood. The officers were also aware that several shootings had recently occurred at houses in the neighborhood occupied by members of the R2 gang and that at least one of those incidents involved bicycle riding perpetrators. The officers further observed the defendant make a gesture consistent with adjusting an unholstered handgun tucked into his pants' waistband.
The officers, until this point unobserved by the defendant or his companions, stepped into the road approximately twenty to twenty-five feet ahead of the three cyclists, two of whom then reversed direction and rode away from the officers. The defendant, upon making eye contact with the officers, immediately uttered an expletive, veered his bicycle away from the officers, stood on his pedals and attempted to accelerate. The officers ordered the defendant to stop; he ignored the command and continued to pedal away. The officers then apprehended the defendant, and, in the course of the ensuing struggle, they discovered and recovered a loaded handgun in the defendant's possession.
At trial, the defendant filed a motion to suppress the handgun recovered by the police officers, contending that they unconstitutionally seized him without reasonable and articulable suspicion and that the evidence subsequently recovered was the fruit of that illegal seizure. In support of this claim, the defendant made two arguments in the alternative. First, he contended that the officers had seized him by walking into the roadway ahead of him and that his attire, companions and an ambiguous hand motion toward the waistband of his pants could not justify seizing him at that point. Alternatively, he contended that, even if the officers had seized him only at the moment they ordered him to stop, the seizure still was unreasonable because the only additional piece of information available to policethe fact that he fledhad been provoked by the police and therefore could not properly contribute to reasonable suspicion. The trial court denied the motion, concluding that the defendant had not been seized until he was ordered to stop and that the defendant's unprovoked flight, combined with the officers' other observations and training, provided sufficient reasonable and articulable suspicion to conduct an investigatory stop. The court further concluded that the defendant's continued flight after being ordered to stop created probable cause for his arrest and that the discovery of the handgun was the result of a permissible search incident to that arrest.[2] The defendant was convicted following a plea of nolo contendere, and this appeal followed.
On appeal, the defendant does not challenge the accuracy of the trial court's factual findings, and he reiterates his contention that the seizure of his person was constitutionally unreasonable. We therefore review de novo the trial court's legal conclusions regarding whether a seizure occurred and whether such a *623 seizure was constitutionally reasonable.[3] "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision. . . . When considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any . . . the encounter between [the police officers] and the defendant constitute[d] an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officers] possessed a reasonable and articulable suspicion [that the individual is engaged in criminal activity] at the time the seizure occurred." (Citation omitted; internal quotation marks omitted.) State v. Courchesne, 296 Conn. 622, 642, 998 A.2d 1 (2010). In assessing whether the police officers possessed the requisite "reasonable and articulable suspicion," we must consider whether, "relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Internal quotation marks omitted.) Id., at 643, 998 A.2d 1.
We begin with the question of when the defendant was seized. The defendant contends that he was seized as soon as the police offers stepped into the road ahead of him; the state rejoins that the defendant was not seized until the officers ordered him to stop. We agree with the state.[4]
"We have . . . defined a person as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) State v. Clark, 297 Conn. 1, 8, 997 A.2d 461 (2010). As the United States Supreme Court has recognized, "[t]he [seizure] test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that *624 conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to `leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).
In the present case, the police officers stepped into the road in front of the defendant and his companions. According to testimony from one of the officers, after walking into the road, the officers were less than halfway between the sidewalk and the line dividing the road's two lanes of traffic and the cyclists were approximately twenty to twenty-five feet away. The officers, though armed and in uniform, did not draw their weapons, attempt to signal or speak to the cyclists, or otherwise make a demonstrable show of authority.
Under these circumstances, we cannot say that by simply stepping into the road the police officers exercised physical force or made a show of authority such that a reasonable person would feel restrained from departing. With respect to the physical force prong of this inquiry, we find little support for the defendant's contention that the two officers, who were approximately twenty feet away and occupied less than one quarter of a two lane road, cut the defendant off or otherwise acted "in an aggressive manner to block [his] course or otherwise control the direction or speed of his movement." Id., at 575, 108 S.Ct. 1975; id. (no seizure when officers in patrol car followed and drove alongside suspect pedestrian); cf. United States v. Kerr, 817 F.2d 1384, 1386-87 (9th Cir.1987) (seizure when officer "pulled into and blocked the one lane driveway as [the defendant] was backing out . . . [which] conduct thus precipitated the confrontation with [the defendant]"); United States v. Bowles, 625 F.2d 526, 532 (5th Cir.1980) (seizure when officer, after passing defendant, "held out his credentials and turned to face [the] defendant, blocking his path and stopping him").
Even though the presence of the police officers in the road did not physically compel the defendant to stop and engage with the officers, we also must carefully examine the communicative effect of the officers' actionsthat is, we must consider how a reasonable person in the defendant's position would interpret the sudden appearance of two uniformed police officers in the roadway. That the officers did not draw their weapons or signal to the defendant cannot be dispositive. It is not only an officer's gun, but also his badge that conveys a police officer's authoritative power, and the arresting effect of two uniformed police officers entering the road and making eye contact should not be too quickly discounted. We therefore must look to the specific factual details that characterize the scene in this particular case.
Upon a review of the totality of the circumstances, we conclude that, although the police officers' act of stepping into the road could not reasonably have been ignored by someone in the defendant's position, that act would not have caused a reasonable person to believe that the only available response was to stop and engage with the officers. In the absence of aggressive behavior or an affirmative signal by the officers, the significance of their presence is necessarily uncertain: the officers' appearance could foreshadow an impending stop, consensual or otherwise,[5] but *625 it could just as easily reflect the officers' desire to passively observe the defendant from a convenient vantage point. Alternately, a reasonable person in the defendant's position might conclude that the police stepped into the street not primarily in order to stop or even watch the cyclists, but, rather, in order to make their existence known and to communicate through such visible police presence that law enforcement was watching over the area. Indeed, the officers' decision to walk into the street could reasonably be construed as signaling nothing at all. To construe such ambiguous police behavior as a seizure for constitutional purposes would be to collapse the important distinction between routine community policing and the exercise of coercive police authority.
We turn next to the moment at which the police officers commanded the defendant to stop. The state, consistent with this court's decision in State v. Oquendo, 223 Conn. 635, 653, 613 A.2d 1300 (1992), concedes that the officers seized the defendant at this point. In analyzing the reasonableness of that stop, we must look to the totality of the information available to the officers at the time to determine whether the officers possessed objective, particularized information rather than a mere subjective hunch, however well-foundedupon which to base the seizure.
We consider the pieces of information available to the police officers in the order in which the unfolding of events brought them to light. Beginning with the relevant background information, we note that the officers were patrolling a neighborhood in which, as they knew, houses occupied by the R2 gang had been targeted in several recent shootings. The officers were further aware that members of the Bloods, a gang known to be in conflict with the R2 gang, could at least sometimes be identified by red clothing and, more specifically, by attire associated with the Cincinnati Reds.[6] These two facts certainly do not entitle the police to search every person wearing red clothing in the Newhallville neighborhood, but they do provide important contextual clues. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. . . . But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[7] *626 (Citation omitted.) Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Similarly, although the fact that a person is wearing attire consistent with gang membership does not supply the sort of particularized information that is required for a valid seizure, that detail does have some place in the analysis of the "whole picture" called for in State v. Courchesne, supra, 296 Conn. at 643, 998 A.2d 1. See United States v. Michael R., 90 F.3d 340, 346 (9th Cir.1996) ("the fact that the young men had haircuts that were characteristic of gang members has evidentiary significance under the totality of circumstances analysis"); United States v. Flett, 806 F.2d 823, 828 (8th Cir.1986) (The Court of Appeals noted, in upholding the stop and frisk of an individual "dressed in attire similar to that of gang members and whose physical appearance matched that of known gang members," that "the factor of similarity of appearance taken alone could not justify a stop and frisk and should be viewed with caution. . . . However, the factor of similarity of appearance and attire taken together with the location of the [defendant] in the home of a known gang member charged with a narcotic violation support a reasonable inference that the [defendant] may be a gang member and may be armed and dangerous." [Citation omitted.]).
We next consider the officers' observation of the defendant making a gesture toward his waist that was consistent with checking or adjusting a concealed weapon. Although testimony on this point was equivocal, and the gesture could perhaps be explained as innocent behavior, as the United States Supreme Court made clear in Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police officers may reasonably act upon observation of "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." We therefore turn to the next in the series of acts leading up to the seizure.
When the cyclists observed the officers stepping into the road ahead of them, the defendant's companions reversed course, while the defendant uttered an expletive, veered away and stood on his pedals in an attempt to accelerate. The defendant, who has conceded the accuracy of all of the trial court's factual findings, nevertheless challenges the permissibility of the officers' relying on his flight as a reasonable basis for seizing him.[8] Specifically, the defendant claims that, because the officers stepped into the road twenty-five feet in front of him, his act of veering was an ambiguous response to police presence and could reasonably be construed as an innocent *627 maneuver required to avoid the physical obstacle posed by the police. Therefore, he asserts, his actions could not be construed as the sort of unambiguous "headlong" and "unprovoked" flight that properly may be considered in forming a reasonable suspicion. See Illinois v. Wardlow, supra, 528 U.S. at 124, 120 S.Ct. 673. We address the significance of each of the modifiers "headlong" and "unprovoked" in turn.
As the United States Supreme Court observed in upholding the seizure of a suspect who, while holding an opaque bag, fled from an area known for frequent drug activity upon seeing police converge on the area, "[h]eadlong flightwherever it occursis the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. The defendant does not contest that police may sometimes take such headlong flight into account when deciding whether to stop a suspect; rather, he asserts that his reaction to the police was too ambiguous to contribute to the formation of a reasonable and articulable suspicion that he was engaged in criminal activity. We are not persuaded.
We agree with the defendant that merely veering off course may be a wholly appropriate response to the sudden appearance of police officers in the roadway and is consistent with "going about one's business. . . ." (Internal quotation marks omitted.) Id., at 125, 120 S.Ct. 673; id. ("[f]light, by its very nature, is not `going about one's business'; in fact, it is just the opposite"). The defendant's claimed innocent explanation for his behavior, however, is belied by the confluence of three related considerations. First, the defendant uttered an expletive in response to seeing the police. Alone a trivial detail, this utterance was accompanied by the defendant's standing up on his pedals in order to accelerate away from the officers. These two acts collectively could, at the very least, be reasonably construed as "nervous, evasive behavior," which "is a pertinent factor in determining reasonable suspicion." Id., at 124, 120 S.Ct. 673. Moreover, the officers also had access to a third piece of information, namely, that the defendant's companions unambiguously reversed direction and rode away upon spotting the police officers. The police properly could have relied on this clear evidence of flight by the other cyclists with whom the defendant was riding to resolve any ambiguity regarding the defendant's own behavioruttering an expletive, veering and acceleratingand to conclude that these actions represented flight from police. See United States v. Wheeler, 800 F.2d 100, 103 (7th Cir.1986) ("The question before the [D]istrict [C]ourt was whether an inference that [the defendant] was armed and dangerous because he entered a bar with a group of men who are [members of the Outlaw Motorcycle Club], seemingly armed, and behaving suspiciously was reasonable. It is significant that the behavior of the group as a whole was suspicious and that led [the officer] to believe they were about to commit a crime involving violence."), overruled on other grounds by United States v. Sblendorio, 830 F.2d 1382, 1393 (7th Cir.1987); United States v. Bell, 762 F.2d 495, 501 (6th Cir. 1985) ("[T]he agent was not obliged to ignore the fact that [the defendant] was in the company of a man known to be potentially armed and dangerous in assessing the potential risk posed by [the defendant] himself. That is, the fact of companionship, while not itself justifying a frisk, was permissibly considered in analyzing whether there was reasonable cause to believe that [the defendant] was potentially armed and dangerous.").
Having concluded that it was objectively reasonable for the officers to conclude that *628 the defendant was fleeing from them, we next consider whether that flight was "provoked" by police conduct. This court has held that, "[w]hile a suspect's flight may, in certain cases, be considered in determining whether there existed a reasonable and articulable basis of suspicion . . . police conduct that provokes flight precludes the consideration of this factor. . . . Were it otherwise, the officer could use the suspicious conduct that he himself induced as evidence that the defendant was acting suspiciously." (Citations omitted; emphasis in original; internal quotation marks omitted.) State v. Oquendo, supra, 223 Conn. at 655-56, 613 A.2d 1300; see id., at 642, 655, 613 A.2d 1300 (holding police could not draw reasonable suspicion from flight that occurred after police had impermissibly stopped defendant). Similarly, the United States Supreme Court held that, where a police officer "affirmatively misrepresented his mission at the outset. . . [and] never adequately dispelled the misimpression engendered by his own ruse"; Wong Sun v. United States, 371 U.S. 471, 482-83, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); the suspect's flight "signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion." Id., at 483, 83 S.Ct. 407. In elaborating on why such flight could therefore not provide reasonable suspicion to justify seizing the suspect, the court explained: "A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked. . . . That result would have the same essential vice as a proposition we have consistently rejectedthat a search unlawful at its inception may be validated by what it turns up." (Citation omitted.) Id., at 484, 83 S.Ct. 407. By contrast, the Supreme Court has characterized as unprovoked a defendant's flight upon observing a caravan of four police vehicles converging on an area known for heavy narcotics trafficking. Illinois v. Wardlow, supra, 528 U.S. at 121-22, 124, 120 S.Ct. 673.
As these cases make clear, the judicial concern over provoked flight does not arise every time police conduct precipitates flight, but, rather, pertains to situations in which police have engaged in the sort of provocative conduct that could cause a reasonable individual to take flight for reasons other than criminal culpability. In the present case, the officers were plainly identifiable as police officers, and the fact that they stepped into the road approximately twenty-five feet in front of the defendant was not itself an illegal seizure or otherwise a provocative act of the sort that would render the defendant's flight necessarily an ambiguous gesture that might as easily reflect reasonable prudence as consciousness of guilt. We therefore reject the defendant's claim that his flight necessarily was provoked.
In light of the entirety of the circumstances of this casethe recent shootings in the area, the defendant's attire, his gesture consistent with handgun possession and concealment, and his unprovoked flight from the policewe conclude that the officers possessed adequate reasonable and articulable suspicion to stop the defendant.[9]
The judgment is affirmed.
In this opinion the other justices concurred.
NOTES
[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199(c) and Practice Book § 65-1.
[2] The defendant does not independently challenge the trial court's determination that his flight furnished probable cause for his arrest or that the gun was seized pursuant to a valid search incident to the arrest.
[3] Although the defendant claims a violation of both the state and federal constitutions, under settled law, "[i]f a party does not provide an independent analysis asserting the existence of greater protection under the state constitutional provision than its federal counterpart. . . we will not of our own initiative address that question." Barton v. Ducci Electrical Contractors, Inc., 248 Conn. 793, 812-13 n. 15, 730 A.2d 1149 (1999). Because the defendant has provided no such independent analysis, we analyze his claim under the assumption that his constitutional rights are coextensive under the state and federal constitutions, except where our case law specifically has held otherwise.
[4] We note that, although the United States Supreme Court has held that a police officer's command to stop does not constitute a seizure if not obeyed; California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); as the state concedes, such a command does constitute a seizure for purposes of article first, §§ 7 and 9, of the constitution of Connecticut. State v. Oquendo, 223 Conn. 635, 652, 613 A.2d 1300 (1992).
[5] In connection with his assertion that he was seized when the police stepped into the street, the defendant claims that, because he was on a bicycle, our analysis should proceed as if he were in a motor vehicle and that a consensual encounter between the defendant and the police was therefore impossible. The defendant raises this claim for the first time before this court and offers no case law to support his contention; moreover, he has failed to show that an "encounter," consensual or otherwise, occurred between him and the police when the police stepped into the road. We therefore do not consider whether a police officer may engage in a consensual encounter with a person on a bicycle. We do note, however, that the constitutional classification sought by the defendant is at best a double-edged sword, for "our automobile exception permits a warrantless search of an automobile whenever the police have probable cause to do so. . . ." (Citation omitted; internal quotation marks omitted.) State v. Winfrey, 302 Conn. 195, 202, 24 A.3d 1218 (2011).
[6] As one of the officers testified, the Cincinnati Reds logo, in addition to being red, signals disrespect for another of the Bloods' rival gangs, the Crips.
[7] The defendant, in support of his contention that the recent shootings involving the Bloods and the R2 gang have "no significance" in the reasonable suspicion analysis, points out that the trial court made no finding that the neighborhood in this case was a "`high crime area.'" We are not persuaded. The relevance of a location's character does not turn on a crude distinction between places defined by the magic words "high crime area" and those not so labeled. The trial court in this case made specific findings regarding the recent, repeated occurrence of crimes involving gun violence in the Newhallville neighborhood and regarding the relationship between the targets of those crimes and another group of identifiable individuals. Our constitution does not require police to ignore these details in making reasonable judgments; indeed, reliance on these specific considerations certainly cannot be more suspect, constitutionally speaking, than the permissible reliance on the generic, value-laden determination that a location qualifies as a "high crime area." See State v. Lipscomb, 258 Conn. 68, 71, 74, 779 A.2d 88 (2001) (reasonable suspicion supported by defendant's presence in "high crime area").
[8] Although the defendant, in his brief and at oral argument before this court, has clearly conceded the accuracy of the trial court's factual findings, he also asserts that the trial court improperly characterized his behavior as an attempted flight. In light of the defendant's blanket concession regarding the trial court's factual findings, we construe his claim as a challenge to the legal significance that properly may be imputed to the defendant's act of fleeing, not as a claim that he did not flee.
[9] As we have noted previously; see footnote 2 of this opinion; the defendant does not independently challenge the lawfulness of his subsequent arrest or the seizure of the pistol.