******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* NICOLAS A. MARCIANO
## (AC 46753)

Alvord, Elgo and Cradle, Js.*

*Syllabus*

The state appealed, on the granting of permission, from the judgment of the trial court dismissing the information charging the defendant with operating a motor vehicle while under the influence of alcohol following the court's granting of the defendant's motion to suppress evidence obtained as a result of his unconstitutional seizure. The state claimed, inter alia, that no constitutional violation occurred because, at all relevant times, the arresting officer was acting in his community caretaking capacity during his encounter with the defendant. *Held*:

The trial court properly concluded that the community caretaking exception to the warrant requirement did not apply because the arresting officer was not acting within his community caretaking capacity when he restricted the defendant's liberty, as there was no evidence in the record that the officer was seeking to prevent the commission of a crime, protect an individual who was in danger of physical harm, resolve a conflict, or maintain a feeling of security in the community.

The trial court properly granted the defendant's motion to suppress because it properly concluded that the defendant had been seized within the meaning of the state and federal constitutions when the uniformed, visibly armed, arresting officer prevented him from driving away by illuminating his vehicle with takedown lights, approaching him, and nonverbally commanding that he roll down his window as, at that time, a reasonable person in the defendant's position would not have felt free to leave the scene.

Argued November 13, 2024—officially released March 18, 2025

*Procedural History*

Information charging the defendant with operating a motor vehicle while under the influence of alcohol, brought to the Superior Court in the judicial district of Tolland, geographical area number nineteen, where the court, *Klatt, J.*, granted the defendant's motion to suppress; thereafter, the court, *Klatt, J.*, on the state's motion, rendered judgment dismissing the information,

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

and the state, on the granting of permission, appealed to this court. *Affirmed.*

*Robert J. Scheinblum*, special assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Jonathan Shaw*, deputy assistant state's attorney, for the appellant (state).

*Nicole Van Lear*, deputy assistant public defender, for the appellee (defendant).

*Opinion*

CRADLE, J. The state of Connecticut appeals from the judgment of the trial court dismissing an information charging the defendant, Nicolas A. Marciano, with operating a motor vehicle while under the influence of alcohol in violation of General Statutes § 14-227a, following its granting of the defendant's motion to suppress evidence obtained as a result of his unconstitutional seizure.[1] On appeal, the state claims that no constitutional violation occurred because, at all relevant times, the arresting officer was acting in his community caretaking capacity. Alternatively, the state argues that, even if the officer was not acting in his community caretaking capacity, the defendant was not unlawfully seized because the officer's conduct did not constitute a show of authority sufficient to cause a reasonable person in the defendant's position to believe that he was not free to leave. We affirm the judgment of the trial court.

The record reflects the following facts found by the trial court after an evidentiary hearing on the defendant's motion to suppress, as supplemented by the undisputed testimony of the arresting officer and the

---

[1] Pursuant to General Statutes § 54-96, the state requested, and the trial court granted, permission to appeal from the judgment of dismissal.

video recording from his body camera.[2] On May 9, 2022, Connecticut State Troopers Brandon Godwin and Andrew Sturmer were on routine patrol in a marked state police cruiser in the vicinity of Route 44 in Mansfield. At approximately 1:30 a.m., the troopers were traveling eastbound on Route 44, near the intersection with Route 195. There is a Cumberland Farms gas station and convenience store located on one corner of the intersection. There are two entrances to the Cumberland Farms parking lot, neither of which was obstructed in any way; there were no signs or gates prohibiting entry to or parking in the lot after business hours. As the troopers approached the intersection, Godwin observed a lone vehicle parked in an unlit area of the Cumberland Farms parking lot, which he found "abnormal" because the Cumberland Farms gas station and convenience store were closed at the time. The vehicle was not parked near the store or the fuel pumps; rather, it was parked along the side of the lot, parallel to the curb. Godwin entered the parking lot "just . . . to make sure everything was all right."

When Godwin entered the parking lot, he parked his cruiser approximately forty to fifty feet from the parked vehicle, facing the driver's side, basically in a "T" position with the vehicle, and immediately illuminated the vehicle with his cruiser's "takedown lights." He observed "an individual inside the car, in the driver's seat, with his head looking down toward the steering wheel." Godwin also observed that there was "some kind of damage to the driver's side rear fender" of the vehicle. Although the cruiser's lights spotlighted the vehicle, the cruiser did not block or otherwise hinder the vehicle's ability to move. Godwin did not activate

---

[2] The trial court noted, and the parties do not dispute, that the video recording from the body camera is the best evidence of the incident at issue. The facts in this case are essentially undisputed.

the overhead flashing red and blue lights or the sirens of his cruiser.

When Godwin exited his cruiser, he observed the defendant sit upright in the driver's seat, start his vehicle and illuminate its headlights.[3] As Godwin continued to approach the defendant's vehicle, he began waving his flashlight toward the defendant in a circular motion, signaling the defendant to roll down his window. When Godwin arrived at the vehicle, the defendant opened the driver's side door a few inches and told Godwin that his window would not roll down. Godwin pulled the door open completely and asked the defendant what he was doing there. Godwin smelled the odor of alcohol emanating from the defendant's vehicle and believed that the defendant's speech was slurred. Godwin checked the defendant's eyes and then asked the defendant to exit his vehicle so that he could perform certain tests. The trial court concluded that it was at this point that Godwin began a criminal investigation, suspecting that the defendant was operating under the influence.[4]

---

[3] Although the parties do not dispute the trial court's factual findings, we note that certain of those findings, specifically as to the sequence of certain events, are imprecise. Specifically, although the court found that the defendant turned on his vehicle in response to Godwin's signal to him to roll down his window, Godwin testified, and the video recording from his body camera confirms, that the defendant started his vehicle as Godwin exited his cruiser. The parties do not dispute this. Likewise, the court noted that Godwin observed damage to the defendant's vehicle when he reached the defendant's vehicle. Godwin testified that he observed a "black . . . discoloration" near the handle of the driver's side rear door when he illuminated his cruiser's takedown lights. When he reached the defendant's vehicle, he realized that the discoloration "appeared to be melted rubber" from the driver's side rear tire. Despite that damage, Godwin testified that the vehicle appeared to be operable.

[4] The court found: "At this time, the trooper also observed that the vehicle had damage to the rear driver's side tire with the tread gone and rubber from the tire melted onto the fender. The defendant indicated to the troopers that he did not own the vehicle and he was waiting for a friend to pick it up. The evidence indicated that he had been parked, with the vehicle off, for some period of time. The defendant had been on his cell phone at the time of the [Godwin's] approach and had the phone in his hand. . . . While

As a result of the investigation, the defendant was arrested and charged with operating a motor vehicle while under the influence in violation of § 14-227a.

On February 23, 2023, the defendant filed a motion to suppress "all evidence derived from law enforcement's encounter with [him] on May 9, 2022," on the ground that "Godwin lacked a legal basis to approach [the defendant], and the evidence against [the defendant] was derived from the illegal approach." On April 21, 2023, the state filed an objection to the defendant's motion to suppress. The state argued that Godwin did not seize the defendant until he smelled the odor of alcohol emanating from the defendant's vehicle and heard his slurred speech, at which time he "developed probable cause to detain him."[5]

On April 21, 2023, the court held an evidentiary hearing on the defendant's motion to suppress and the

[Godwin] approached on his own, the second trooper was at the vehicle within a minute."

[5] In its memorandum of law objecting to the defendant's motion to suppress, the state argued: "The basis of the defendant's motion [to suppress], while not explicitly stated, seems to be that by simply driving his police vehicle into the gas station and parking, [Godwin] had seized the defendant. However, [Godwin] did not seize the defendant until later in their encounter, after developing probable cause that the defendant was operating his vehicle under the influence. . . . The defendant was not seized when [Godwin] entered the gas station, parked his vehicle, and approached the defendant's vehicle." (Citation omitted.) The state asserted that there was no use of physical force and there was not a "sufficient show of authority such that a reasonable person would not have felt free to leave." In support of this assertion, the state argued that "Godwin observed a vehicle parked at a closed gas station at 1:30 in the morning. He parked a significant distance away from the vehicle, his overhead flashing lights and sirens were not on, and he did not restrict the vehicle's ability to move. He approached the vehicle alone, slowly, did not have a firearm drawn, did not provide any verbal commands and spoke calmly. It was not until he detected the odor of alcohol and heard the defendant speak in a slurred manner that he developed probable cause to detain him." On the basis of those facts, the state asserted that the defendant was not seized by Godwin and that Godwin did not require a " 'lawful basis' " to approach the defendant.

state's objection to that motion. The state presented the testimony of Godwin and introduced into evidence the video recording from Godwin's body camera. The defendant did not present any witnesses but introduced into evidence two portions of the video recording from Godwin's body camera, an overhead photograph of the Cumberland Farms and two photographs from the night in question.

On May 9, 2023, the defendant filed a posthearing memorandum of law in support of his motion to suppress, wherein he argued: "[The defendant] was seized, at the latest, when Godwin waved his lit flashlight in [the defendant's] direction as Godwin continued to walk toward [the defendant]. In the seconds before, Godwin drove into the Cumberland Farms parking lot and turned on his 'takedown' light[s] as he stopped his patrol car. The bright spotlight was pointed directly at [the defendant]—the only person in the parking lot. . . . Although a reasonable person may have believed he was not free to leave once the takedown light[s] [were] trained on him, [the defendant] may have believed otherwise because he started the engine and turned on his car's lights. . . . He never left, however, because Godwin waved his lit flashlight in [the defendant's] direction at least ten times immediately after [the defendant] started the engine and turned on the car's lights. . . . Godwin also continued to walk toward [the defendant] as he waved the flashlight at him. Godwin no doubt understood [the defendant] starting his engine and turning on the car lights as a manifestation of [the defendant's] intention to leave the parking lot. Godwin therefore waved his flashlight as soon as [the defendant] started the engine in a way that communicated to [the defendant] that he was not free to leave. . . . [The defendant] never moved the car once Godwin started waving his flashlight as he continued walking in [the defendant's] direction because a reasonable person in

[the defendant's] position would not have felt free to leave." (Citations omitted; emphasis omitted.)

On May 22, 2023, the state filed its posthearing memorandum of law in support of its objection to the defendant's motion to suppress. In support of its contention that Godwin's stop of the defendant was not unconstitutional, the state alleged: "Godwin observed a vehicle parked in a closed gas station at 1:30 in the morning. Utilizing his role as a community caretaker, [he] entered the gas station parking lot. Upon entering, he observed an individual in the driver's seat who appeared to be hunched over or asleep, and he wanted to inquire if he needed assistance. [Godwin] parked a significant distance away from the defendant, did not utilize his overhead lights, and his siren was not on. He approached the defendant's vehicle alone, in a slow and calm manner, did not have his firearm drawn, and did not give any commands to the defendant. As [Godwin] exited his vehicle, he heard and observed the [defendant] start his vehicle. [Godwin] did not return to his vehicle and try to stop the defendant, he did not try to block him in or prevent him from driving, and he did not chase after him or verbally tell him to stop, evidencing the fact that the defendant was not being detained at that time. During his approach of the vehicle, [Godwin] noticed that the vehicle had significant, recent damage and that the rear driver side tire had nearly no tread.[6] . . . When the defendant opened his car door, due to his window not working, [Godwin] immediately detected the odor of alcohol emanating from the vehicle. Upon speaking with the defendant, [Godwin] noted that his speech was slurred. Due to the overwhelming

---

[6] As noted in footnote 3 of this opinion, Godwin testified that he observed discoloration near the driver's side rear tire of the defendant's vehicle when he illuminated his takedown lights. Godwin testified that, when he reached the defendant's vehicle, he realized that the discoloration "appeared to be melted rubber" from the driver's side rear tire.

odor of alcohol, the defendant's slurred speech, and the damage to the [defendant's] vehicle, [Godwin] had reason to believe that the defendant was operating his motor vehicle under the influence of alcohol and asked him to step out of the vehicle for further examination. It was at this point that [Godwin] seized the defendant." (Footnote added.)

On June 6, 2023, the defendant filed a reply to the state's objection to his motion to suppress wherein he reiterated his argument that a reasonable person in his position would not have felt free to leave the parking lot under the circumstances and that his "seizure was not justified under the community caretaking doctrine." The defendant asserted that "Godwin lacked the empirical facts necessary to interfere with [the defendant's] freedom of movement under the community caretaking doctrine" because "the location and manner in which [the defendant's] car was parked did not give rise to a belief that he was in distress or in need of aid," there had been no reports of any concerns related to the defendant's vehicle, and, "upon Godwin's arrival, there was no indication that [the defendant] was in any distress or need of aid." The defendant also asserted that, "even if [the defendant's] mere presence in a safe parking lot with open ingress and egress that serviced a convenience store that was brightly lit initially justified Godwin's decision to check on his well-being, including due to the observation of [the defendant's] lowered head, any concerns Godwin may have felt for [the defendant's] health were dispelled once [the defendant] lifted his head, started the car's engine and turned on the lights and/or pressed the brake pedal upon Godwin's approach . . . ." (Footnote omitted.)

On June 21, 2023, the court issued a memorandum of decision wherein it granted the defendant's motion to suppress. The court agreed with the defendant's argument that he was seized, at the latest, when Godwin

waved his flashlight at him and ordered him to roll down his window. The court reasoned: "The defendant was in a parked vehicle, alone in a dark parking lot in the early morning hours. He was in a completely isolated, rural location, [with] no other pedestrians or vehicles in the near vicinity [and] no other businesses open at that time. He was on his phone, presumably waiting for a friend to pick up the vehicle.

"[Godwin's] approach, while not blocking the defendant's path, also clearly indicated the officer's intent to speak with him and [that the defendant should] not leave the area. The video demonstrates that the 'take-down lights' spotlighted the defendant and the vehicle in an intimidating fashion. The defendant was effectively pinned in place by the lights. There was no question that the lights were coming from a clearly marked police cruiser. Within seconds, an armed police officer was approaching the defendant, signaling with his flashlight to roll down the window of the vehicle. These actions clearly communicate to an individual: 'Do not leave because I want to speak with you.' "

The court found that, "in consideration of the totality of the circumstances, a reasonable person in the defendant's position, with the location, with the lights used, the trooper's approach, and the motioning with the flashlight, would not believe he would be free to leave." The court also found that, at the time of the seizure, Godwin lacked a reasonable and articulable suspicion of criminal activity.

The court rejected the state's argument that Godwin approached the defendant's vehicle in his role as a community caretaker and ruled that the community caretaking exception to the warrant requirement did not apply in this case. The court explained: "The sole evidence offered by the state was [Godwin's] testimony, indicating that, while on patrol, he observed a lone car

in the parking lot of a closed business, which he thought was 'unusual' and 'abnormal.' There was nothing about how the vehicle was parked to indicate worry or concern. There were no complaints regarding that vehicle, no reports of criminal activity or accidents. There was nothing readily observable about the vehicle itself, i.e., no flashers, hood extended, etc., that would render a belief that the operator needed assistance. The video evidence revealed the defendant, who was seated upright, look toward the cruiser once the 'takedown lights' illuminated him.

"Not every lone vehicle parked along the side of the road or in an empty lot, even in a rural location, is or should be considered 'abnormal.' If the concern was a need for medical assistance, that concern should have dissipated once the defendant looked and responded to the officer's presence. While the trooper testified that he had observed damage in the rear driver's side of the vehicle, this would not have been visible to the officer at the time the vehicle was first observed and only after the trooper began his approach. Further, the trooper testified that the vehicle . . . still appeared operational."

On the basis of the foregoing, the court concluded that the evidence obtained that night was seized in violation of the fourth and fourteenth amendments to the United States constitution and article first, § 7, of the Connecticut constitution and ordered that it be suppressed.

The state thereafter asked the court to dismiss the charge against the defendant and sought permission to appeal the court's granting of the motion to suppress, which the court granted. This appeal followed.

The standard of review for a motion to suppress is well settled. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence

and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Pompei*, 338 Conn. 749, 756, 259 A.3d 644 (2021).

Here, the state does not challenge the trial court's factual findings but, rather, contends that the court erred in concluding that Godwin was not acting within his community caretaking capacity and that the defendant was seized when Godwin signaled the defendant with his flashlight to roll his window down. We address each claim in turn.

I

The state first claims that the court erred in granting the defendant's motion to suppress because Godwin was acting in his community caretaking capacity at all times during his encounter with the defendant. We disagree.

Consistent with our standard of review pertaining to a court's ruling on a motion to suppress, "in reviewing the applicability of the community caretaking [doctrine], the trial court's subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the [community caretaking] doctrine in light of these

facts will be reviewed de novo." (Internal quotation marks omitted.) Id.

"The fourth amendment to the United States constitution prohibits unreasonable searches and seizures by government agents. Subject to a few well defined exceptions, a warrantless search and seizure is per se unreasonable. . . . The state bears the burden of proving that an exception to the warrant requirement applies when a warrantless search [and seizure have] been conducted." (Footnote omitted; internal quotation marks omitted.) Id., 757.

The exception to the fourth amendment's warrant requirement that the state argues applies to the present case is known as the community caretaking exception. The United States Supreme Court first described the community caretaking functions in *Cady* v. *Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). There, the Supreme Court explained that "[l]ocal police officers, unlike federal officers, frequently . . . engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id., 441.[7]

---

[7] "The defendant in *Cady* was convicted of murder after incriminating evidence was found during a warrantless search of his motor vehicle following an automobile accident. . . . The police officers searched the defendant's motor vehicle because they knew that he was an off duty Chicago police officer who was required by regulation to carry his service revolver at all times. . . . The court in *Cady* rejected the defendant's contention that the search was illegal, concluding that the search was standard procedure in [that police] department, to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands. . . . The police had not violated the defendant's fourth amendment rights when they searched the trunk of his parked vehicle, the court held, because they reasonably believed that it contained a loaded revolver that could endanger the public if left unsecured." (Citations omitted; internal quotation marks omitted.) *State* v. *Pompei*, supra, 338 Conn. 758–59. Like *Cady*, the majority of cases that discuss the community caretaking function of police officers involve inventory searches of motor vehicles.

It has since been explained that "[s]afeguarding individuals and their property from harm is the essence of the community caretaking function of the police." (Internal quotation marks omitted.) *United States* v. *Best*, 415 F. Supp. 2d 50, 56 (D. Conn. 2006). It "involves routine, nonemergency duties undertaken to protect the public . . . ." *State* v. *Pompei*, supra, 338 Conn. 758 n.5.

Our Supreme Court has observed that "it is not always a simple matter to delineate precisely pursuant to which function [the] police are acting in carrying out a particular search or seizure. In fact . . . [p]olice often operate in the gray area between their community caretaking function and their function as criminal investigators. Often there is no bright line separating the one from the other . . . . In many instances, however, it is possible to discern whether the police are acting in their crime control or investigative functions, or instead are acting pursuant to their community caretaking function." (Internal quotation marks omitted.) *State* v. *Curet*, 346 Conn. 306, 324, 289 A.3d 176 (2023). "[T]he police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventive patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 537, 88 A.3d 491 (2014).

Our Supreme Court has held that a police officer acting in a community caretaking capacity may make "a reasonable intrusion not prohibited by the fourth amendment." *State* v. *Tully*, 166 Conn. 126, 133, 348 A.2d 603 (1974). "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." (Internal quotation marks omitted.) Id., 144. "The police must have a valid reason grounded in empirical facts rather than subjective feelings to believe that a limited intrusion into liberty or property interests is justified . . . . It is an objective and not a subjective test . . . that looks to the totality of the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Pompei*, supra, 338 Conn. 757–58.

Here, the state has steadfastly maintained, before the trial court and now this court, that the defendant was not seized until Godwin smelled the odor of alcohol, heard the defendant's slurred speech, and asked the defendant to step out of his vehicle so he could commence an investigation to determine whether the defendant was operating while under the influence. The state acknowledges, however, that there was "some restriction on . . . [the defendant's] liberty" when Godwin turned on his takedown lights, approached the defendant and signaled to him to roll down his window. The state argues that this restriction of the defendant's liberty was justified because Godwin was acting in his community caretaking capacity. The state argues that, "[c]ontrary to the trial court's conclusion, from the time that the troopers were on routine patrol and first saw the defendant's car until the defendant opened the driver's door and the troopers smelled alcohol and heard his slurred speech, the troopers' activities were 'totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal

statute.' " The lack of empirical facts supporting a reasonable belief that the exercise of their community caretaking function was the basis of their conduct belies this argument.

Godwin testified that he first noticed the defendant's vehicle in the Cumberland Farms parking lot when he was driving through the intersection on routine patrol. He further testified that, at that time, he did not notice if the vehicle was occupied. In fact, the defendant's vehicle was off and parked on private property. It was parked parallel to the curb and was not askew. There was nothing about the manner in which it was parked, or its appearance, to indicate that it was disabled when Godwin entered the parking lot. There were no gates or other barriers preventing the public from accessing or parking in the lot when the business was closed, and there were no signs prohibiting entry or trespassing. There had been no reports that the vehicle had been involved in any type of incident or had been stolen. There had been no report as to how the vehicle got there or how long it had been there. There was no sign of distress or threat to life or property. Other than a parked car on the private property of a closed business, there was simply no basis for Godwin's stated purpose of entering the parking lot—to "make sure everything was all right."[8]

Once Godwin pulled into the parking lot, he noticed the defendant in the driver's seat of the vehicle, with his head looking down toward the steering wheel, and

---

[8] On cross-examination at the suppression hearing, Godwin was asked whether there was any sign of an individual in the vehicle being in distress. Godwin began to explain: "No, but, you know, in reference to, you know, what's been going on in Mansfield, and, you know, the past couple years there's been . . . ." His explanation was interrupted by defense counsel, who objected to the testimony as beyond the scope of his question and asked that the testimony be stricken. The court sustained the objection but did not strike the testimony.

what appeared to be damage to the vehicle near the rear driver's side tire. Godwin testified that, at that point, he thought there was a possible emergency, in that he believed the defendant could be in distress. Godwin testified that he heard the engine of the defendant's vehicle go on and observed the brake lights illuminate when he was exiting his cruiser, and the defendant's head was not down anymore. At that point, when the defendant raised his head and started his vehicle, the stated basis for Godwin's exercise of his community caretaking function—to check on the defendant's well-being—ceased to exist. Godwin, however, was undeterred by the defendant's movement. Although the defendant did not, at any point, show any signs of distress or in any way indicate that he needed assistance, Godwin nevertheless continued to approach the defendant's vehicle and waved his flashlight at the defendant several times, essentially ordering him to stay where he was located and to roll down his window. Because it was clear that the defendant was not in distress once he started the car and lifted his head, Godwin had no reasonable basis to restrict the defendant's liberty.[9]

In support of the state's argument that Godwin acted in his community caretaking capacity when he restricted the defendant's liberty, the state relies on our Supreme Court's decision in *State* v. *Pompei*, supra, 338 Conn. 749.[10] In *Pompei*, our Supreme Court affirmed the denial

---

[9] Although Godwin asked the defendant if he was okay, he first asked him what he was doing there.

[10] The state also relies on *State* v. *Drummond*, 305 N.J. Super. 84, 701 A.2d 958 (App. Div. 1997), in which the Appellate Division of the Superior Court of New Jersey held that the arresting officers were justified in making a community caretaking inquiry when they observed a vehicle parked with its lights off next to a closed car wash facility shortly before midnight because those experienced officers deemed it "atypical for the location." Id., 88. Not only are we not bound by New Jersey case law, but the reasoning of that case fails to account for the principle, stated therein, that "a reasonably objective police officer" acting in his community caretaking capacity is justified in "making an inquiry on property and life . . . ." (Internal quotation marks omitted.) Id. Other than stating that the circumstance was

of the defendant's motion to suppress, explaining that "[the arresting officer] was not acting in a criminal investigatory capacity when he parked his patrol car behind the defendant's motor vehicle but, rather, was responding to a dispatch from a concerned citizen who had reported an unconscious male in a Ford Focus in the Cumberland Farms parking lot at 1:56 a.m. [The officer] did not activate the lights on his patrol car and parked behind the defendant's vehicle because he wanted 'to keep it from being able to roll backwards or backup until [he] could ascertain the situation at hand.' [The officer] exited his patrol car and observed the unconscious or sleeping defendant in the driver's seat with the engine running. [The officer] knocked on the driver's side window to rouse the defendant and to ascertain whether he required medical attention. Indeed, consistent with this purpose, the first question [the officer] asked the defendant was whether he was okay." Id., 760. The court held: "In light of the limited 'purpose and scope of the intrusion,' as well as the complete dearth of evidence indicating that 'this was a general exploratory' or 'pretext[ual]' stop . . . we conclude that the defendant's encounter with [the officer] falls squarely within the community caretaking doctrine." (Citation omitted.) Id., 760–61.

The present case is factually distinguishable from *Pompei* in important ways. First, the officer in *Pompei* was responding to a report from a citizen that there was an unconscious male in a vehicle parked in the Cumberland Farms parking lot at 1:56 a.m. Id. The state asserts that this is a "distinction without a difference . . . because in both instances the police had no reason

"atypical," the officers offered no other facts in support of their initial approach of the defendant. Id. As noted herein, Connecticut case law does not support a restraint on one's liberty in furtherance of community caretaking in the absence of empirical facts that support an objective belief that life or property are at risk.

to suspect any criminal wrongdoing when they encountered the motorist [and] approached his car . . . .” We disagree. The report from a citizen to the police that there was an unconscious male in a running motor vehicle provided empirical facts upon which the officers in *Pompei* reasonably relied in believing that the driver of the vehicle may have needed assistance. See *State v. Pompei*, supra, 338 Conn. 760. Here, Godwin’s initial decision to enter the parking lot was based solely upon his belief that it was abnormal for a car to be parked in the lot of a closed business late at night. He had no knowledge at that time that the vehicle was even occupied. That decision, therefore, was more akin to investigating a suspicious vehicle than to safeguarding life or property. Additionally, in *Pompei*, the defendant’s vehicle was running; id.; whereas the defendant’s vehicle in the present case was not. An unconscious driver of a running vehicle can be, for obvious reasons, more concerning than a driver sitting in a vehicle that is not running. Lastly, even if we were to agree that Godwin was acting in his community caretaking capacity on the basis of his limited explanation that he believed that it was abnormal for a car simply to be parked in the parking lot of a closed business, that he was concerned for the defendant’s well-being because the defendant’s head was facing down toward the steering wheel and there appeared to be damage to the vehicle, that concern would have been dispelled when the defendant lifted his head and then turned on his car and illuminated the headlights of his own vehicle. In *Pompei*, the defendant was unconscious when the officer knocked on his window. Id. When the defendant here lifted his head and started his vehicle, there was no basis, rooted in community caretaking, for Godwin to restrict the defendant’s liberty, as the state concedes that he did, by continuing to approach him and commanding that he roll down his window.

The present case is also distinguishable from *State v. Foote*, 85 Conn. App. 356, 857 A.2d 406 (2004), cert. denied, 273 Conn. 937, 875 A.2d 43 (2005), and cert. denied, 273 Conn. 937, 875 A.2d 44 (2005), also cited by the state, in which this court held that an officer who observed a disabled vehicle on the shoulder of a highway with its hazard lights on and people standing outside of it initially "was not engaged in an investigatory stop of criminal activity, but rather was acting in accordance with his community caretaking function." Id., 358, 361–62. Unlike the case at hand, it was clear that the vehicle in *Foote* was disabled and therefore needed assistance. See id., 358. It also was on a public roadway, presenting a hazard to the public in general and to the vehicle's occupants. See id.

In the absence of any empirical facts to support a reasonable belief that the defendant in the present case was in distress, which was Godwin's stated basis for approaching him, the state has failed to demonstrate that Godwin's encounter with him was not an impermissible general exploratory stop. As stated herein, the presence of such facts is necessary to ensure that the community caretaking doctrine is not abused and relied upon as pretext to justify an unconstitutional restriction of one's liberty. We emphasize that our determination of whether Godwin was exercising his community caretaking function is a fact intensive analysis. On the basis of the record before us, we are persuaded that this is not a case in which Godwin was seeking to prevent the commission of a crime, protect an individual who was in danger of physical harm, resolve a conflict or maintain a feeling of security in the community. There were no empirical facts demonstrating the existence of a threat to anyone's life or property or to the public at large. Accordingly, we agree with the trial court's conclusion that Godwin was not acting within his community caretaking capacity when he restricted the defendant's liberty.

## II

Alternatively, the state claims that, even if the trial court correctly determined that Godwin was not acting within his community caretaking capacity when he restricted the defendant's liberty, the court erred in concluding that the defendant was unconstitutionally seized when Godwin illuminated his vehicle with take-down lights, approached his vehicle and signaled to him to roll down his window.[11] Specifically, the state argues that the defendant was not seized at that point because Godwin's conduct did not constitute a show of authority sufficient to cause a reasonable person in the defendant's position to believe that he was not free to leave. We disagree.[12]

We begin by setting forth the legal test used to determine when a person is seized for purposes of the federal and state constitutions.[13] "[A] person is seized when,

[11] As noted herein, the state concedes that the defendant's liberty was restricted to "some" extent at that point. The state argues, however, that the defendant was not seized until Godwin smelled the odor of alcohol emanating from the defendant's vehicle, causing him to commence a criminal investigation.

[12] The state concedes that Godwin did not have a reasonable and articulable suspicion to seize the defendant until he smelled the odor of alcohol emanating from his vehicle and heard his slurred speech.

[13] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

Article first, § 7, of the Connecticut constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

Although our Supreme Court has determined that, under certain circumstances, the relevant provisions of the state constitution provide broader protection from unreasonable search and seizure than does the fourth amendment; see, e.g., *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992); our analysis and resolution of the present appeal would be the same under either constitution.

by means of physical force or a show of authority, his freedom of movement is restrained. . . . The key consideration is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . The inquiry is objective, focusing on a reasonable person's probable reaction to the [officers'] conduct. . . . In situations in which the police have not applied any physical force, we must conduct a careful [fact intensive] examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority [such that a reasonable person in the defendant's position would not have believed he was free to leave] . . . .

"Factors to be considered in determining whether police conduct projects coercion include, but are not limited to: the number of officers and vehicles involved; whether the officers are uniformed; whether the officers are visibly armed or have their weapons drawn; whether the vehicles involved are marked police cruisers, whether the vehicles' sirens and emergency lights are activated, and whether the vehicles' headlamps or spotlights illuminate the defendant; whether the defendant is alone or otherwise appears to be the target of police attention; the nature of the location, including whether it is public or private property; whether the defendant is surrounded or fully or partially blocked in by the police; the character of any verbal communications or commands issued by the police officers; whether the officers advise the detainee of his right to terminate the encounter; the nature of any physical contact; whether the officers pursue after an initial attempt by the defendant to leave; whether the officers take and retain possession of the defendant's papers or property; and any other circumstance or conduct that bespeaks aggressiveness or a show of force on the part of the police, or suggests that the defendant is

under suspicion or otherwise not free to leave. . . . Although it is true that not all personal intercourse between [the police] and citizens involves seizures of persons . . . and that law enforcement officers must be free to engage in healthy, mutually beneficial inter-course with the public . . . it is equally true that use of coercion beyond that inherent in any police-citizen encounter transforms these sorts of informal, voluntary interactions into seizures." (Citations omitted; internal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 50–51, 145 A.3d 861 (2016).

"It is well established that we must undertake a more probing factual review of allegedly improper seizures, so that we may come to an independent legal determina-tion of whether a reasonable person in the defendant's position would have believed that he was not free to leave. . . . A proper analysis of this question is neces-sarily fact intensive, requiring a careful examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority . . . . Although we must, of course, defer to the trial court's factual findings, our usual deference . . . is qualified by the necessity for a scrupulous exam-ination of the record to ascertain whether [each] finding is supported by substantial evidence . . . . Further-more, in reviewing the record, we are bound to consider not only the trial court's factual findings, but also the full testimony of the arresting officers; in particular, we must take account of any undisputed evidence that does not support the trial court's ruling . . . but that the trial court did not expressly discredit." (Citations omitted; internal quotation marks omitted.) Id., 38–39.

Here, the defendant was in the sole car parked on private property, "where police would not be expected to routinely patrol"; id., 58; when Godwin entered the parking lot, parked his cruiser and spotlighted him with

its takedown lights,[14] making it clear that he was the target of police attention. Although Godwin did not have his weapon drawn when he emerged from his cruiser and approached the defendant waving his flashlight, he was uniformed and visibly armed. The defendant started his vehicle and illuminated its headlights, presumably to leave. At that point, Godwin, by his actions of continuing to approach the defendant and commanding him with his flashlight to roll down his window, stopped the defendant from leaving. In other words, Godwin's response to the defendant starting his vehicle and illuminating its lights—to continue to approach the defendant and emphatically signaling him to roll down his window—would have caused a reasonable person to believe that the only available response was to stop and engage with Godwin. There could have been no other reasonable interpretation of Godwin's nonverbal command.

"It is well settled that a reasonable citizen would not feel free to disregard a verbal command to stop issued by an armed, uniformed police officer. See *State* v. *Benton*, [304 Conn. 838, 844 n.4, 43 A.3d 619 (2012)] (state conceded that police officer's command to stop constitutes seizure for purposes of state constitution); *State* v. *Oquendo*, [223 Conn. 635, 647–48 n.8, 613 A.2d 1300 (1992)] (similar); *State* v. *Williamson*, 10 Conn. App. 532, 540, 524 A.2d 655 (order to halt, standing alone, constituted seizure), cert. denied, 204 Conn. 801, 525 A.2d 965 (1987); see also *United States* v. *Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (command to halt is example of police conduct that conveys to reasonable person that he is not free to leave) [cert. denied, 580

---

[14] The state also argues that the court erred "in concluding that the troopers' use of their cruiser's spotlights, in conjunction with [Godwin's] use of a flashlight to signal to the defendant to roll down his window, constituted a coercive display of authority." We disagree. In light of the surrounding circumstances, we consider the use of the takedown lights a factor further supporting the conclusion that the defendant had a reasonable belief that he was not free to leave. See *State* v. *Edmonds*, supra, 323 Conn. 58–59.

U.S. 901, 137 S. Ct. 241, 196 L. Ed. 2d 184 (2016)]; *In re Martin H.*, Docket No. B151148, 2002 WL 1732650, *3 (Cal. App. July 25, 2002) (when an officer commands a citizen to stop, this constitutes a detention because the citizen is no longer free to leave . . . ); *Blake* v. *State*, 939 So. 2d 192, 195 (Fla. App. 2006) ([i]f . . . the officer phrases his or her inquiries as commands, this action would indicate that the individual was not free to leave); M. Raymond, 'The Right to Refuse and the Obligation to Comply: Challenging the Gamesmanship Model of Criminal Procedure,' 54 Buff. L. Rev. 1483, 1493 (2007) ([P]olice commands or orders create seizures. The quintessential command is the order to stop . . . .)." (Internal quotation marks omitted.) *State* v. *Edmonds*, supra, 323 Conn. 59–60. Similarly, the circumstances of the present case support the trial court's conclusion that Godwin's continued approach, after the defendant started his vehicle, coupled with the motion of the flashlight toward the defendant to roll down his window, constituted a command to stop. Accordingly, having considered all of the relevant circumstances and all of the undisputed evidence in the record, we are compelled to conclude that a reasonable person in the defendant's position would not have felt free to leave the scene and that the defendant was seized no later than when Godwin successfully commanded him to stop.

In sum, we agree with the trial court's conclusions that Godwin was not acting in his community caretaking capacity when he stopped the defendant and that the defendant was seized within the meaning of the state and federal constitutions when Godwin prevented him from driving away by approaching him and commanding that he roll down his window. Accordingly, we conclude that the court properly granted the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.